NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 11, 2008
Decided July 9, 2008

**Before**

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 07-3460

| | |
|---|---|
| ARMEN TONOYAN,<br>　　*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | No. A97-883-903 |
| MICHAEL B. MUKASEY, Attorney<br>General of the United States,<br>　　*Respondent*. | |

**O R D E R**

Armen Tonoyan, a native and citizen of Armenia, fled to the United States and filed a petition for asylum, withholding of removal, and protection under the Convention Against Torture, arguing that he had been subjected to political persecution and would be again if he returned to Armenia. The immigration judge denied relief and ordered that Tonoyan be removed, and the Board of Immigration Appeals affirmed. Because the immigration judge's decision is supported by substantial evidence, we deny Tonoyan's petition for review.

Before he fled to the United States in April 2004, Tonoyan lived in Yerevan, Armenia, with his wife and daughter. He received a degree in teaching and composing and began working at Dunn Kilikio Restaurant in June 2002 as the leader of a band that entertained customers in the evenings. Although his application for asylum was based on political persecution, he testified that he has never been involved in politics and has "never been interested in the political affairs." Dunn Kiliko is located near government offices in Yerevan, and therefore its customers are mostly government officials.

The events leading Tonoyan to flee Armenia are related to elections that were held there in 2004 for a local office similar to that of mayor in the United States. Three candidates were running for the position—Gagik Peklaryan,[1] who was the incumbent, Artur Grigoryan, and Armen Mikaelyan. On February 9, 2004, Grigoryan dropped out of the race and endorsed Mikaelyan. The next day when Tonoyan arrived at work he saw a group of men talking about politics and recognized one of them as Grigoryan. He then saw four men come into the restaurant and call over to Grigoryan. He recognized one of these men as Serge Beglaryan, who is the incumbent Peklaryan's nephew. Grigoryan went with the men to a corner of the restaurant, out of Tonoyan's sight. Tonoyan soon heard loud noises and went to investigate. He found Grigoryan on the floor, bleeding from his nose and mouth. The restaurant's owner called the police, but by the time they arrived, all of the men involved in the fight had left. The owner told the police that Tonoyan was a witness, and the police took Tonoyan to their headquarters for questioning. At first, he told the police that he did not know any of the men who attacked Grigoryan because he was afraid of Beglaryan, but he eventually gave them Beglaryan's name after the police beat him. The police told Tonoyan that he would have to testify in court and then released him. He heard that the police arrested Beglaryan the next day. Several days later, Peklaryan won the election.

Tonoyan did not go into work for at least one day after being questioned by the police. On February 15, however, shortly after he came home from work around 3:00 a.m., four men knocked on his door. When he opened the door, they pushed him to the floor, held his hands behind his back, covered his mouth, and beat him. He recognized

---

[1] The incumbent's name may actually be Gagik Beglaryan. A search online of the name Gagik Beglaryan shows that there is someone by that name who holds elected office in Yerevan, Armenia, while a search of the name Gagik Peklaryan does not bring up any links. We have used Peklaryan, though, because that is the name Tonoyan used in his testimony.

one of his attackers as one of the men who had beaten up Grigoryan. While they hit him, they said that they were doing it "for Serge" and threatened to kill Tonoyan if he testified. They also told him to think about his wife and daughter. Tonoyan ended up needing surgery to repair the broken nose he suffered as a result of this attack.

Tonoyan panicked because he felt stuck between the police, who were forcing him to testify against Beglaryan, and Beglaryan's men, whom he called the "mafia." He took a bus to the suburb where his mother-in-law lived and stayed there with his wife and daughter until April 15. He did not contact the police to report what had happened or to ask for protection because he did not trust them and was afraid that they were tied to Peklaryan, Beglaryan's uncle, and therefore would not help him. He and his wife decided that he should flee to the United States because they were afraid that Beglaryan's men were still looking for him. He obtained a visitor's visa, telling United States officials that he wanted to come here to do research and study jazz music.

Tonoyan arrived in the United States around April 15, 2004, and was authorized to stay until May 14, but he has not left. His wife and daughter continue to live in Armenia, though they moved to a different home in Yerevan. As of May 2006, Peklaryan was still in office, and Beglaryan had been released from custody. Tonoyan's wife told him that the trial against the men who beat Grigoryan is not moving forward because there are no witnesses.

Tonoyan applied for asylum and withholding of removal in December 2004, and at his first hearing in January 2005, Tonoyan conceded that he was present in the United States without authorization and sought asylum, withholding of removal, and relief under the Convention Against Torture (CAT). His request for relief was based on the beating he sustained from Beglaryan's men, which he argued constituted political persecution, and his fear that they would make good on their threats to harm him and his family if he testified against Beglaryan, which he thought he would have to do if he returned to Armenia. Tonoyan, representing himself, presented only his testimony, documentation of his nose surgery, and country reports about conditions generally in Armenia.

Though the immigration judge (IJ) credited Tonoyan's testimony, she denied his request for asylum, concluding that he had not shown that the men who beat him were "motivated, at least in part, by an actual or imputed" political opinion. Pointing to the statements that the men made to Tonoyan, the IJ reasoned that the men did not want Tonoyan to testify against Beglaryan for his beating of Grigoryan and that they were

interested in him only because his testimony could land Beglaryan in prison.  The IJ recognized Tonoyan's fear of returning to Armenia and even suggested that it was objectively reasonable, but ultimately she found that Tonoyan's attackers did not know his political opinion and that they did not impute one to him.  Having denied his request for asylum, the IJ also denied his requests for withholding of removal and protection under CAT, noting that both require higher standards that Tonoyan did not meet.

Tonoyan hired counsel and appealed the IJ's decision, arguing that he had established a well-founded fear of future persecution.  The Board of Immigration Appeals (BIA) adopted and affirmed the IJ's decision, noting in particular that the IJ correctly found that Tonoyan had not shown that Beglaryan's men beat him "on account of . . . an actual or imputed political opinion."  The BIA reasoned that Tonoyan's attackers said that they were beating him for Beglaryan, not because of any political opinion against their cause that they had imputed to him.

In his petition for review, Tonoyan challenges only the denial of asylum.  He argues that the IJ and the BIA erred by not considering Tonoyan's case under a mixed-motives analysis when they concluded that Beglaryan's men beat Tonoyan only to keep him from testifying against Beglaryan in a criminal prosecution.  Tonoyan contends that, to the contrary, he presented substantial evidence, which the IJ and BIA ignored, showing that these men imputed to Tonoyan an anti-Peklaryan opinion because he spoke to the police and would possibly testify in the future against Peklaryan's nephew and that this opinion motivated the men to beat him.  He bases this argument on the context of the events, suggesting that the harm he suffered was politically motivated because the men beat him on behalf of the incumbent's nephew to prevent Tonoyan from making public a crime committed by this nephew against his uncle's political rival, which could have hurt his uncle's chance at re-election.

Where, as here, the BIA adopts and affirms the IJ's opinion and provides only some additional reasoning, we review the IJ's decision as supplemented by the BIA's opinion.  *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004).  We uphold the denial of relief if it is supported by substantial evidence considered on the record as a whole.  *See Zhang v. Gonzales*, 495 F.3d 773, 776 (7th Cir. 2007); *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007) (quoting

*INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).[2]  We will reverse the BIA's decision only if no reasonable fact finder could fail to conclude that the petitioner should be granted asylum.  *See Elias-Zacarias*, 502 U.S. at 481; *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006).  To qualify for asylum, the applicant must show by a preponderance of the evidence that he meets the definition of "refugee."  *See* 8 C.F.R. § 208.13(a); *Sosnovskaia v. Gonzales*, 421 F.3d 589, 593 (7th Cir. 2005).  A refugee is a person "who is unable or unwilling to return to . . . [his home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42); *Gjerazi*, 435 F.3d at 808.

The government properly notes in its brief that we may not consider Tonoyan's argument that the IJ and BIA failed to apply a mixed-motives analysis to his case because he did not administratively exhaust this claim.  When an applicant fails to present an argument to the BIA, he has failed to exhaust administrative remedies, which precludes this court's review.  *See* 8 U.S.C. § 1252(d)(1); *Pjetri v. Gonzales*, 468 F.3d 478, 481 (7th Cir. 2006).  Nevertheless, even if we were to consider Tonoyan's argument, it would fail.  We have adopted the doctrine of mixed motives, under which an applicant "may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is" an enumerated ground.  *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005).  Here, the IJ properly stated the law when she said that Tonoyan was required to show that the men who beat him were "motivated, at least in part, by an actual or imputed" political opinion.  In cases where we have reversed an IJ's decision for failure to apply the mixed-motives analysis, the IJ ignored evidence showing that the persecutors were motivated in part by one of the enumerated grounds.  *See, e.g., Gjerazi*, 435 F.3d at 812-13; *Mohideen*, 416 F.3d at 570-71.  The IJ here, however, recounted and considered all of Tonoyan's testimony, credited that testimony, and then

---

[2] The "substantial evidence" standard was reflected in the former 8 U.S.C. § 1105a(a)(4), which the Supreme Court interpreted in *INS v. Elias-Zacarias* to provide that a "determination that [the petitioner] was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" 502 U.S. at 481 (quoting 8 U.S.C. § 1105a(a)(4)).  Section 1105a(a)(4) was repealed in 1996 and replaced by 8 U.S.C. § 1252(b)(4)(B), which provides that on appeal "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  Although this language differs from that in the subsection it replaced, this court has continued to characterize its review in terms of "substantial evidence."  *See Chen v. U.S. Dep't of Justice*, 434 F.3d 144, 157 n.9 (2d Cir. 2006).

concluded that the evidence did not show that the persecutors had any motive other than preventing Tonoyan from testifying against Beglaryan.

Moreover, substantial evidence supports the IJ's and BIA's conclusion that Tonoyan was not persecuted on account of an imputed political opinion. To successfully base an asylum claim on an imputed political opinion, the applicant must show that his persecutors attributed a political opinion to him, *see Lwin v. INS*, 144 F.3d 505, 509 (7th Cir. 1998), and that this opinion motivated the persecution, *see Elias-Zacarias*, 502 U.S. at 482-83. *Mema v. Gonzales*, 474 F.3d 412, 417 (7th Cir. 2007). The IJ and BIA correctly concluded that Tonoyan did not show that the men who beat him attributed a political opinion to him or that a political opinion motived them. Tonoyan argues that they must have attributed a political opinion to him—that he was anti-Peklaryan because he identified Peklaryan's nephew for the police and was going to testify against him, thereby hurting Peklaryan's re-election bid. This argument is based entirely on the fact that political actors were involved in the crime he witnessed and also were possibly involved in the beating he sustained. But "the mere existence of a generalized 'political' motive . . . is inadequate to establish" that persecution was on account of a political opinion. *Elias-Zacarias*, 502 U.S. at 482. Moreover, none of Tonoyan's testimony even suggested that this so-called imputed political opinion was anything more than speculation. Tonoyan recounted that the men said that they were attacking him for Beglaryan and threatened to kill him if he testified against Beglaryan; they did not mention Peklaryan or the upcoming election, and Tonoyan did not offer any other evidence to suggest that they had imputed a political opinion to him, much less that they were motivated by it.

Though Tonoyan's situation is sympathetic, it is not one that qualifies him for asylum. He was the unfortunate witness to a crime that happened to involve politicians. Although the attack on Grigoryan may have been politically motivated, that does not mean that the attack on Tonoyan at the hands of those trying to keep him quiet amounted to political persecution. *See Djouma v. Gonzales*, 429 F.3d 685, 688 (7th Cir. 2005) (reasoning that "[b]eing a material witness, even to a political crime . . . is no more a status that the asylum law protects than being a criminal suspect is"); *Carmenatte-Lopez v. Mukasey*, 518 F.3d 540, 542 (8th Cir. 2008) (holding that petitioner's "alleged status as a witness or informant, even with respect to a political crime, would not qualify him for asylum or withholding of removal on the basis of political opinion"). Tonoyan tries to distinguish *Djouma* by arguing that the police were persecuting Djouma for not cooperating as a material witness to a political crime, whereas Tonoyan was being persecuted by non-governmental actors. In his reply brief, he backs away

from this argument and contends that *Djouma* does not apply because Djouma was seeking asylum as a material witness whereas Tonoyan applied for asylum based on persecution for an imputed political opinion. Neither interpretation is persuasive. The first—the difference between who was persecuting the applicants—makes no difference on the issue of whether an imputed political opinion motivated his persecution, and the second presupposes that Tonoyan was actually persecuted because of an imputed political opinion, which, as discussed above, he did not demonstrate.

Tonoyan also argues that his situation is similar to that in *Deloso v. Aschcroft*, 393 F.3d 858 (9th Cir. 2005), in which the son of an elected official from a democratic political party who personally participated in pro-democratic political events was persecuted by a hit man for the Communist party. But that case is not similar to Tonoyan's, most notably because Tonoyan did not participate in politics or make his political opinion known publicly.

For the foregoing reasons, we DENY Tonoyan's petition for review.