# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2456

GHULAM MUSTAFA, *et al.*,

*Petitioners,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A98-139-201; A98-139-256; A98-139-257;
A98-139-258 & A98-139-259

ARGUED JANUARY 18, 2013—DECIDED FEBRUARY 11, 2013

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Ghulam Mustafa and his family seek review of a decision of the Board of Immigration Appeals in which the Board affirmed the immigration judge's denial of their applications for asylum and withholding of removal. Mustafa, a citizen of Pakistan and member of the Nawaz faction of the Pakistani Muslim League political party ("PML-N"), filed an application

for asylum and withholding of removal on the basis that he fears if he were to return to Pakistan, he would be targeted for having cooperated with the opposition government under General Pervez Musharraf by providing information about the financial affairs of his former employer, who is also a former Pakistani Senator. In affirming the immigration judge's denial of the application, the Board explained that Mustafa could not establish a fear of future persecution on account of a protected statutory ground. Instead, the Board concluded that the threats and attacks Mustafa had experienced before coming to the United States were motivated solely by a personal dispute between Mustafa and his former boss and that he had not shown that the current government would persecute him on account of his membership in the PML-N. We grant the Mustafa family's petition for review and remand the case for further proceedings because the conclusion that Mustafa's attackers were motivated solely by a desire for personal revenge is unsupported by substantial evidence in the record.

## I. Background

### A. Factual Background

Mustafa, a forty-eight-year-old citizen of Pakistan, and his family entered the United States legally as non-immigrant visitors in November 2003. The Mustafas were authorized to stay in the United States until May 27, 2004. Two days before the expiration of his visa, Mustafa filed an application for asylum and withholding

of removal, asserting that he feared returning to Pakistan because he believed he would be targeted for having provided the Musharraf government with information about the financial affairs of a former Pakistani Senator. Mustafa's wife and three of the couple's minor children were named as derivatives on the application.[1]

### 1. Mustafa's Life in Pakistan and the United Arab Emirates

In the affidavit he attached to his asylum application and during his hearing, Mustafa stated that he has been an active member of the PML-N since 1988 when he was a student at the University of Punjab in Lahore, Punjab, Pakistan. After graduating, Mustafa moved to Abu Dhabi, United Arab Emirates ("UAE"). In 1996, Saifur Rehman, a high-ranking member of the PML-N and soon-to-be Pakistani senator, hired Mustafa to work for him as the Public Relations Officer at Redco Al Suwaidi Ready Mix ("Redco"), Rehman's construction business in the UAE. In addition to managing daily assignments and employee relations at Redco, Mustafa assisted Rehman with several transfers of funds. On one occasion,

---

[1] Mustafa's wife is a forty-three-year-old native and citizen of Pakistan. The couple has three children who are citizens of Pakistan and who are currently eighteen, sixteen, and fourteen years old. Mustafa and his wife also have an eight-year-old daughter who was born in Chicago in 2004, who is a citizen of the United States, and who is not part of their removal proceedings.

Rehman directed Mustafa to transfer eighteen million dollars in multiple transactions from Citibank in New York to Mashraq Bank in New York and ultimately to Abu Dhabi. Because of Rehman's political power and his close association with Nawaz Sharif, the leader of the PML-N, Mustafa did not ask any questions about the transfer.

In 1997, the PML-N won the parliamentary elections in Pakistan and Sharif took command as Prime Minister. During the shift in power, Rehman was elected to the Pakistani Senate, and he served as the chairman of the National Accountability Bureau ("NAB"), an agency created to investigate and prosecute public corruption. After the elections, Rehman told Mustafa that the Pakistani Inter-Services Intelligence Agency would be monitoring all of Mustafa's telephone conversations at Redco as a part of an investigation of the NAB. When he learned of the surveillance, Mustafa began looking for other work, and he eventually resigned from his position at Redco in 1998.

In October 1999, Sharif attempted to remove General Pervez Musharraf from his position as the Chief of Army Staff. Musharraf resisted and with the help of other Army Generals took power of the country and ousted Sharif's administration. After the coup, the Musharraf government acted quickly in arresting former PML-N leaders. Rehman and Sharif were among those detained, and Sharif went into exile shortly thereafter.

Mustafa reports that in early 2000, Pakistani intelligence agents in the UAE approached him and in-

formed him that Rehman had engaged in corrupt activi-
ties. The agents told Mustafa that because he was
a member of the PML-N, he was required to cooperate
with the Musharraf government and that if he refused
to cooperate, there would be "trouble" and his family
in Pakistan could be arrested. Fearful that his family
would be targeted, Mustafa agreed to participate in
the investigation and provided the Pakistani authorities
with information about certain accounts and large
financial transactions he had overseen at Redco. In
August 2000, Mustafa returned to Pakistan in ac-
cordance with the government's request and provided
further assistance in the investigation. In addition to
asking about Rehman's affairs at Redco, the govern-
ment questioned Mustafa about a relationship between
Rehman's wife and Sharif. When Mustafa refused to
answer questions about Rehman's personal life, the
government put Mustafa's name on Pakistan's Exit
Control List.[2] Concerned once again that his family
would be harmed if he refused to cooperate, Mustafa
ultimately agreed to answer the government's ques-
tions. Once the government officials were satisfied with
his assistance, they removed Mustafa's name from the
list and allowed him to return to the UAE.

Upon the completion of the investigation, the Mushar-
raf government prosecuted Rehman on corruption

---

[2] The Exit Control List is a border-control system maintained
by the Pakistani government. Persons whose names appear
on the list are not allowed to leave the country.

charges and sentenced him to fourteen years in prison. After reaching an apparent agreement with the government, however, Rehman was released from jail in 2002. When Rehman returned to the UAE following his release, a Redco employee called Mustafa and told him "Rehman would never forgive [him] and he was going to get [him] for having talked to the NAB about his affairs." After receiving this call, Mustafa went to Rehman's factory to explain why he had assisted in the investigation. Rehman disagreed with the explanation and in response threatened Mustafa, telling him, "you know my powers. I was running the country. I was equal to [the] prime minister in Pakistan and . . . I could . . . wipe you up in a minute."

In February 2003, Mustafa recalls that the car he was driving in the UAE was trapped between two trucks and that the trucks were of the type used by Redco. He believes that Rehman or his associates tried to kill him by making it look like an accident, which he reported to be a common occurrence in countries like Pakistan and the UAE. Although Mustafa reported the accident to the police, he does not believe that the police took any action. Instead, shortly after the accident occurred, three plainclothes policemen came to his house, told him that it was not safe for him to remain in the UAE, and informed him that he was "playing with fire." After this confrontation, Mustafa reports he was followed, harassed, and questioned for several months until he eventually decided to escape the torment and move back to Pakistan with the rest of his family.

But the harassment continued. When Mustafa arrived in Pakistan in August 2003, his brother received a call from Rehman's brother, Atikir, inquiring into Mustafa's whereabouts. Referring to Mustafa, Atikir said, "[h]e betrayed my brother . . . . He pass[ed] this information on to [the government] and due to this action, we were in trouble so we want to get revenge." Although Mustafa's brother told Atikir that Mustafa was still living somewhere in the UAE, Rehman's associates located Mustafa in Pakistan. On October 5, 2003, Mustafa and a friend were driving in Mustafa's car when another car pulled in front of them and blocked them from going any farther. A group of men exited the car with guns and approached Mustafa's vehicle. The men dragged Mustafa and his friend out of the car and beat and kicked them for more than twenty minutes. During the attack, the men accused Mustafa of being a "traitor" and told him not to cross Rehman ever again. Mustafa lost consciousness after being hit in the head and was taken to a hospital for treatment. He received seven stitches and remained in the hospital for more than a week. Mustafa reported the incident to the police, but the police took no action. Mustafa believes that the Pakistani government would never protect him from Rehman's retribution.

Following the beating, Mustafa returned briefly to the UAE to sell his car, collect his salary, and settle his accounts. He then traveled to the United States with his family because he no longer felt safe living in either Pakistan or the UAE. He received nearly six months of medical treatment after arriving in the United States

to assist with the memory loss and speech disorder that he experienced after the beating. He remains an active member of the Chicago chapter of the PML-N and works to support his family.

### 2. Current Government in Pakistan

In 2008, the Pakistan People's Party ("PPP") and the PML-N defeated General Musharraf's government in parliamentary elections. The PPP and the PML-N formed a coalition government and initiated impeachment proceedings against General Musharraf, who eventually resigned. The PML-N then left the coalition because of a disagreement over whether to reinstate judges removed by General Musharraf. Asif Ali Zardari, a member of the PPP, was elected as the new president of Pakistan in September 2008, shortly after the assassination of his wife, Benazir Bhutto. Mustafa testified at his hearing that the PLM-N plays an important role in current Pakistani politics and holds the second greatest number of parliamentary seats. He also testified that Rehman is currently living in Qatar and that there is an outstanding warrant for Rehman's arrest in Pakistan relating to his treatment of Zardari while the PML-N was in power in 1999.[3] Mustafa fears if he and his family were to return to Pakistan, Rehman or his associates would persecute them in further retribution for his assistance to the Musharraf government.

---

[3] Mustafa also testified that the Zardari government has arranged for Rehman's arrest through the International Criminal Police Organization ("INTERPOL").

### 3. Supporting Documentary Evidence

In support of his asylum application, Mustafa submitted an affidavit from Dr. Karen Parker, an attorney specializing in international law who has studied human rights in Pakistan. In the affidavit, which she wrote in October 2007, Dr. Parker summarized Pakistan's political structure, discussed the prevalence of human rights violations, and shared her position on Mustafa's likelihood of future persecution in Pakistan. She explained that most members of the PML-N are "highly loyal to Sharif and his associates," and that it is typical for political parties to have "thugs" in place to "carry out retaliation against perceived enemies." Dr. Parker expressed her view that Mustafa had been attacked by "thugs" from the PML-N and noted that the type of "attack he suffered is typical of political retaliation." Dr. Parker also opined that Mustafa could face persecution from the Musharraf government, which was still in power at the time she signed her affidavit, on account of his membership in the PML-N.

Also included in the record before the immigration judge were the State Department's 2006 and 2009 country conditions reports for Pakistan and several news articles addressing the country's political instability. Both country reports indicate that corruption among the police is common in Pakistan. According to the reports, Pakistani police have been known to charge fees to investigate genuine complaints and to accept bribes on behalf of those wishing to avoid charges. The reports also confirm "politically motivated killings" perpetrated by "political factions."

**B. Procedural Background**

The United States Citizenship and Immigration Services denied Mustafa's application for asylum and withholding of removal and referred him and his family to the Immigration Court for removal proceedings. On October 14, 2004, the Department of Homeland Security filed a Notice to Appear for each family member charging their removability for overstaying their period of admission. On October 11, 2005, the Mustafas appeared before an immigration judge, and through counsel, conceded removability. For relief from removal, however, Mustafa renewed his application for asylum and requested withholding of removal and protection under the Convention Against Torture ("CAT"), claiming that he has a well-founded fear that if he were to return to Pakistan, he would be persecuted on account of his membership in a particular social group and his political opinion.

**1. Immigration Judge**

Mustafa appeared in front of an immigration judge for a hearing on his renewed application for asylum and withholding of removal on April 1, 2010. At the hearing, Mustafa testified about the harassment he experienced in the UAE and in Pakistan and elaborated on the beatings that occurred shortly before he left for the United States. Mustafa's friend, Mohammed Asif, who was with him in his car on the day of the attack in Pakistan corroborated his testimony about the beatings, and Mustafa's then sixteen-year-old son Mohab testified

that he visited his father in the hospital after the attack. When pressed by the immigration judge to explain the social group of which he was a member, Mustafa clarified through counsel that his claim for asylum was based solely on his fear of persecution on account of his actual or imputed political opinion.

At the conclusion of the testimony, the government argued that the conflict between Mustafa and Rehman was a personal dispute not based on political affiliation. In response, Mustafa's counsel stated, "Yes, your Honor. It's true that at the core it involves a vendetta between two people," but emphasized that the attacks could not be separated from the political context in which they occurred. He explained that governments in Pakistan use corruption and political investigations "to effect harm on political rivals" and argued that Mustafa was persecuted on account of "political opinion or imputed political opinion" for having assisted in the Musharraf government's politically motivated investigation of Rehman.

Although the immigration judge found Mustafa's testimony to be generally credible,[4] she concluded that he

---

[4] The immigration judge noted two discrepancies between Mustafa's testimony and Asif's testimony. Both men claimed to have been driving Mustafa's car on the day of the attack in Pakistan, and Mustafa recalled that the incident occurred in October while Asif thought it happened in August. Nevertheless, she explained that the inconsistencies were slight

(continued...)

did not show a nexus between any past or future persecu-
tion and a protected statutory ground. She noted that
until the Musharraf government's investigation, Rehman
and Mustafa had no disputes or disagreements tied at
all to political opinion and that "when Mr. Rehman's
agents beat [Mustafa] they let him know that he was
paying the price for providing information about
Mr. Rehman to the authorities—not because of any dif-
ference of political opinion between the two men." Ac-
cordingly, she determined that Mustafa's attackers
were motivated solely by a desire to inflict personal
retribution.

The immigration judge briefly addressed a portion of
Dr. Parker's testimony that suggested Mustafa could
face persecution from the current Pakistani government,
but she ultimately gave it little weight because of the
change in political power in Pakistan that occurred
after Dr. Parker signed her affidavit:

> Dr. Parker's testimony states that "General political
> violence has dramatically increased, with members
> of especially the Muslim League (N) and the PPP
> political parties being targeted." However, that
> letter was written in October 2007, when Gen.
> Musharraf's military government was still in power.

---

[4] (...continued)
and did "not significantly undermine the probative weight
of the totality of [Mustafa's] testimony, especially in light of
the fact that the incident occurred seven years ago."

> Since then, the PML-N and the PPP have regained political power.

Admin. R. at 85-86 (internal citations omitted).

Because Mustafa could not satisfy the lower burden of proof for asylum, the immigration judge concluded that he did not meet his burden for the purpose of withholding of removal. The immigration judge also held that Mustafa was not entitled to protection under the CAT because he did not meet his burden of proving he would "more likely than not" be tortured upon returning to Pakistan.

### 2. Board of Immigration Appeals

On September 14, 2010, Mustafa appealed his case to the Board of Immigration Appeals. Mustafa argued that the immigration judge concluded incorrectly that the harm he had suffered was solely on account of a personal vendetta rather than a political opinion his attackers had imputed to him. He claimed that the Pakistani government used information he had provided to convict Rehman on corruption charges, which in turn "led Rehman and his supporters and other members of the PML-N to perceive [him] as a 'traitor' to their political party." Mustafa elaborated that by cooperating in the investigation, he was seen has having "assist[ed] enemies of the PML-N in targeting and suppressing a leading member of the [PML-N] and the Sharif government." Mustafa also argued that the immigration judge did not understand or even consider the danger that he would

face from current Pakistani President Zardari and his followers if he were to return to Pakistan.

The Board upheld the immigration judge's decision and dismissed Mustafa's appeal on May 21, 2012. The Board held that the immigration judge did not err in concluding that Mustafa's attackers were motivated solely by a desire for personal revenge. It determined there was insufficient evidence in the record to support Mustafa's contention that Rehman and his followers imputed an anti-PML-N political opinion to him or that any perceived anti-PML-N political opinion motivated the attacks. Specifically, the Board found Mustafa's attackers' use of the word "traitor" to be unconvincing because "[t]he context of its use suggests . . . that he was seen as betraying Rehman rather than the party: he was warned not to cross Rehman and to be loyal to Rehman." Finally, the Board agreed with the Department of Homeland Security that Mustafa did not sufficiently articulate his fear of persecution from the current Pakistani government before the immigration judge and that he did not adequately explain why the Zardari government would seek to harm him for his prior association with Rehman when he cooperated with the Musharraf government's criminal investigation of Rehman.

## II. Discussion

On appeal, Mustafa does not challenge the immigration judge's ruling with respect to his eligibility for protection under the CAT, so we address only his claims for

asylum and statutory withholding of removal. Our review of the Board's denial of asylum and withholding of removal is deferential; we require only that the decision be "supported by reasonable, substantial and probative evidence on the record considered as a whole." *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We will reverse the Board and grant an applicant's petition for review, however, when the evidence in the record is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) (quoting *Elias-Zacarias*, 502 U.S. at 483-84). When the Board adopts the decision of the immigration judge and supplements that decision with its own reasoning, as it did here, we review the immigration judge's decision as supplemented by the Board. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011).[5]

To be eligible for asylum, an applicant must show that he is "unable or unwilling to return" to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An ap-

---

[5] The Attorney General suggests that we should limit our review to the Board's decision, but the Board did not issue a stand-alone opinion in this case. *See Liu v. Ashcroft*, 380 F.3d 307, 311-12 (7th Cir. 2004). Instead, the Board agreed with the immigration judge's findings and conclusions and supplemented the decision with additional reasoning.

plicant who successfully proves that he was subject to past persecution is presumed to have a well-founded fear of future persecution, which the Attorney General can rebut by demonstrating a change in conditions in the applicant's home country. 8 C.F.R. § 1208.13(b)(1). Under the mixed-motives doctrine applied by this circuit prior to the enactment of the REAL ID Act, which applies in this case,[6] an applicant may qualify for asylum if his persecutors had more than one motive for their conduct so long as the applicant demonstrates by either direct or circumstantial evidence that his persecutors were "motivated, at least in part, by one of the enumerated grounds." *Gjerazi v. Gonzales*, 435 F.3d 800, 812 (7th Cir. 2006) (internal quotation marks omitted); *see also Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005).

Qualification for withholding of removal requires an applicant to meet a higher standard. The applicant must show that there is a "clear probability" his "life or freedom would be threatened . . . because of [his] race, religion, nationality, membership in a particular group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *Guardia v.*

---

[6] The REAL ID Act of 2005 now requires an applicant to show that one of the five protected grounds was a "central reason" for his persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i). The record in this case indicates, however, that Mustafa filed his original application for asylum by May 25, 2004, and thus, pre-REAL ID standards and case law apply. *See Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005) ("This rule affects only new asylum applicants (whose applicants are filed after May 11, 2005) . . . .").

*Mukasey*, 526 F.3d 968, 972 (7th Cir. 2008). As with an application for asylum, a showing of past persecution creates a rebuttable presumption that the applicant's life or freedom would be threatened in the future for the purpose of withholding of removal. 8 C.F.R. § 1208.16(b)(1).

## A. Past Persecution by Rehman and His Associates

Mustafa's claims for relief are premised on his assertion that he has been and will be persecuted on account of his political opinion in Pakistan. But Mustafa does not argue that his assailants targeted him on account of his membership in the PML-N. Rather, he contends that they viewed him as being an opponent of or a traitor to their party for having cooperated in the Musharraf government's politically motivated prosecution of Rehman.[7] To succeed on a claim that one suffered

---

[7]   This argument is distinct from one in which an applicant asserts that he was persecuted on account of his opposition to government corruption or an imputed anti-corruption political opinion. *See, e.g.*, *Haxhiu v. Mukasey*, 519 F.3d 685, 690 (7th Cir. 2008) (explaining that individuals who "engage in political agitation against state corruption, such as whistleblowers, can be persecuted on account of a political opinion" (internal quotation marks omitted)). In addition to considering Mustafa's claim that he had been persecuted on account of an imputed anti-PML-N opinion, the Board, like the immigration judge, addressed whether Mustafa had been persecuted on account of

(continued...)

persecution due to an imputed political opinion, an applicant must show (1) that his persecutors attributed a political opinion to him and (2) that the attributed opinion motivated the persecution. *Sankoh v. Mukasey*, 539 F.3d 456, 471 (7th Cir. 2008). In its opinion, the Board concluded that there was insufficient evidence in the record to support Mustafa's contention that Rehman and his followers perceived Mustafa to have defected their political party. Instead, the Board affirmed the immigration judge's conclusion that the context of the attacks suggested that Mustafa was seen as having betrayed Rehman personally.

This court has repeatedly held that "[a] personal dispute, no matter how nasty, cannot support an alien's claim of asylum." *Marquez v. INS*, 105 F.3d 374, 380 (7th Cir. 1997); *see also Wang v. Gonzales*, 445 F.3d 993, 998 (7th Cir. 2006). And there is surely evidence in the record to support the view that Mustafa's attackers were motivated in part by a personal dispute. But the critical question here is whether the record compels this court to conclude that Rehman and his followers were also motivated by a perception that Mustafa acted with an anti-PML-N sentiment in cooperating with the Musharraf government. During Mustafa's hearing, his counsel acknowledged that the persecution at its core involved

---

[7] (...continued)
an actual or imputed anti-corruption political opinion. Mustafa's focus on appeal, however, is on the anti-PML-N political opinion he contends his attackers imputed to him.

a dispute between two parties, but clarified that in Pakistan, investigations like the one against Rehman are part of the country's politics. Mustafa argues that turning against Rehman for the purpose of an investigation was equivalent to turning against the party itself and that Mustafa's assailants had indicated their disapproval by calling him a "traitor" during their attack.

In her decision, the immigration judge cited the doctrine of mixed motives with approval but did not engage in a thorough discussion or evaluation of the evidence of dual motives Mustafa presented. The Board similarly overlooked significant circumstantial evidence when it rejected the proposition that Rehman and his associates viewed Mustafa as having an anti-PML-N opinion. Specifically, the Board concluded that the attackers' use of the word "traitor" implied that Mustafa had betrayed Rehman personally only because the attackers had also warned Mustafa not to "cross" Rehman. But this conclusion does not address the larger factual context in which the harassment and attacks occurred. Following the upheaval in Pakistan in 1999, the Musharraf regime arbitrarily arrested and detained political figures from the Sharif government in an attempt to suppress and control the political opposition and discredit high-ranking members of the PML-N. The Musharraf government gave Mustafa the "choice" of participating in its investigation of a former Senator and close associate of a former prime minister or having his family arrested. Mustafa informed the Musharraf government of his knowledge of Rehman's financial affairs, including several large transfers of funds, and in

effect, assisted in the Musharraf government's politically motivated takedown of a PML-N official. Following his release from prison and during an encounter with Mustafa, Rehman disagreed with Mustafa's explanation for having assisted the Musharraf government and emphasized his political power in delivering a threat. He indicated that he had been running the country, that he was as powerful as the prime minister, and that he could quickly destroy Mustafa. After Mustafa returned to Pakistan, four men who accused him of being a "traitor" beat him for more than twenty minutes until he lost consciousness, and the police took no action.[8]

The immigration judge and the Board also overlooked the portion of Dr. Parker's affidavit addressing the attack Mustafa experienced in Pakistan in 2003. Dr. Parker explained that most members of the PML-N are highly loyal to Sharif and his associates and that it is common for political parties in Pakistan to employ "thugs" to carry out retaliatory acts against those they view as enemies. The affidavit also indicated that it is Dr. Parker's belief that Mustafa had been attacked by "thugs" working for the PML-N and that the attack fit the mold

---

[8]   The Board also deferred to the immigration judge's conclusion that the attackers had "let [Mustafa] know that he was paying the price for providing information about Mr. Rehman to the authorities—not because of any difference of political opinion between the two men." The immigration judge's reading of the attackers' message, however, was based on the same limited view of the context in which the beating occurred.

of political retaliation. The immigration judge's only reference to the affidavit related to Dr. Parker's opinion about the likelihood that Mustafa would face persecution from the Musharraf government. Because Dr. Parker signed the affidavit in 2007 while the Musharraf regime was still in power, the immigration judge explained that the affidavit did little to support the view that Mustafa could face persecution from the current Zardari government. But the fact that Dr. Parker authored the report in 2007 does not alter the relevance of her testimony relating to the attack that occurred in 2003.

Contrary to the Attorney General's suggestion, this case is distinguishable from *Tonoyan v. Mukasey*, 288 F. App'x 278 (7th Cir. 2008) (nonprecedential decision), in which we held that a petitioner who faced persecution for having reported the identity of an individual involved in a politically motivated attack did not show that his persecutors "were motivated, at least in part, by an actual or imputed political opinion." *Id.* at 282 (internal quotation marks omitted). In *Tonoyan*, an Armenian citizen who had witnessed a crime involving a local political candidate applied for asylum, withholding of removal, and protection under the CAT. *Id.* at 279. The alleged persecution in *Tonoyan* occurred in close proximity to a local election for an office similar to that of a mayor in the United States. *Id.* Shortly before the election, one of the challenging candidates dropped out of the race and endorsed the other challenger. *Id.* The day after the endorsement, Tonoyan witnessed four men, one of whom he recognized to be the nephew of the

incumbent in the race, attack the candidate who had dropped out and endorsed the remaining challenger. *Id.* At first, Tonoyan told the police that he did not know any of the men involved in the attack because he was afraid of the incumbent's nephew. *Id.* at 280. But the police beat him until he gave them the nephew's name. *Id.* The next week, four men came to Tonoyan's house and attacked him. *Id.* The men told Tonoyan they were carrying out the attack for the incumbent's nephew and threatened to kill him if he testified against their friend. *Id.*

Although the immigration judge found Tonoyan credible, she denied his request for asylum, concluding that the men attacked him not on account of an imputed political opinion, but because they wanted to prevent him from testifying against their friend. *Id.* at 280-81. The Board affirmed. *Id.* at 281. On appeal to this court, Tonoyan argued that the immigration judge and the Board erred by not engaging in a mixed-motives analysis. *Id.* at 281. We denied the petition for review in an order, concluding that even if Tonoyan had administratively exhausted his mixed-motives claim, he could not point to any evidence in the record that his attackers had acted in part on account of an imputed political opinion that the immigration judge and the Board had not considered. *Id.* at 282. We also held that substantial evidence supported the immigration judge's and the Board's conclusion that Tonoyan was not persecuted on account of an imputed political opinion. Although political actors were involved in the crime Tonoyan witnessed, we explained that his attackers "said that they were attacking him for [the nephew] and

threatened to kill him if he testified against [their friend]; they did not mention [the incumbent's name] or the upcoming election." *Id.*

Here, unlike in *Tonoyan*, Mustafa's attackers explicitly stated that they were carrying out their attack on behalf of a high-ranking member of the PML-N. The immigration judge and the Board did not address evidence in the record of the highly polarized political context in which the attacks occurred. The immigration judge and the Board also omitted any reference to Rehman's conversation with Mustafa in which Rehman disagreed with Mustafa's explanation for having cooperated with the Musharraf government and emphasized his political power in delivering a threat. Moreover, the immigration judge and the Board dismissed without explanation the portion of Dr. Parker's testimony in which she analyzed the political nature of the 2003 attack. Collectively, this evidence, which was present in the record but absent from the analysis below, sheds a different light on Mustafa's attackers' use of the word "traitor" during the beating. Mustafa assisted in the takedown of a high-ranking member of the PML-N immediately after the 1999 shift in power in Pakistan, and in the context of the facts articulated above, it would be unreasonable to conclude that his actions were viewed by his attackers as solely apolitical.

We have repeatedly held that an applicant is entitled to a reasoned analysis of his case, "not one which wholly ignores or disregards relevant, probative evidence." *Gjerazi*, 435 F.3d at 813; *see also Mohideen*, 416 F.3d at 571.

In concluding that Mustafa's attackers were motivated simply by a personal dispute, the immigration judge and the Board erred in disregarding evidence in the record that the attackers acted with mixed motives. This case presents a unique set of facts that ultimately compel the conclusion that Mustafa's attackers were motivated in part by an anti-PML-N political opinion they attributed to him. Mustafa is therefore entitled to a presumption in favor of granting asylum. On remand, the government will have the opportunity to rebut that presumption by proving that "[t]here has been a fundamental change in circumstances such that [he] no longer has a well-founded fear of persecution" or that he "could avoid persecution by relocating to another part of" Pakistan if "it would be reasonable to expect [him] to do so." 8 C.F.R. § 1208.13(b)(1)(i).

The immigration judge's denial of Mustafa's withholding of removal claim was premised entirely on her initial determination that Mustafa was not persecuted on account of political opinion. Having determined that the record compels a contrary conclusion, Mustafa is also entitled to a presumption that his life or freedom would be threatened if he were to return to Pakistan. 8 C.F.R. § 1208.16(b)(1)(i). On remand, the government may rebut this presumption by showing a fundamental change in circumstances or the reasonableness of a safe relocation elsewhere in Pakistan. 8 C.F.R. § 1208.16(b)(1)(ii).

**B.  Fear of Persecution by the Zardari Government**

Mustafa argues that the immigration judge and the Board also erred in refusing to consider the persecution he could face from the current government in Pakistan on account of his membership in the PML-N and his prior close association with Rehman and Sharif. He further contends that members of the Zardari government could, under threat of arrest, force him to provide informa- tion about Rehman if Rehman were arrested and prose- cuted on actual or fabricated charges. Mustafa testified that President Zardari has an even greater reason to seek retribution against Rehman than the Musharraf government because President Zardari blames Rehman for arbitrarily imprisoning him under harsh conditions and for an alleged assassination attempt that occurred while he was in the custody of the Sharif government. In dismissing Mustafa's arguments relating to the Zardari government, the Board concluded that Mustafa did not sufficiently articulate a fear of persecution before the immigration judge and did not adequately explain why the government would seek to harm him.

With regard to Mustafa's general argument that the Zardari government will target him on account of his membership in the PML-N, we agree with the Board that Mustafa did not sufficiently articulate this fear to the immigration judge. But even if he had, his argu- ment would fall short. Mustafa does not cite to any docu- ment or testimony in the record to support his conten- tion that the Zardari government is taking action against political leaders and factions that are no longer

in power. The Board appropriately rejected Mustafa's reliance on the portion of Dr. Parker's testimony in which she discussed the likelihood that Mustafa would be persecuted by the current Pakistani government. Dr. Parker signed her affidavit in 2007 before President Zardari was elected and before the PML-N gained a considerable number of seats in the parliament. The current government in Pakistan is therefore significantly different from the government Dr. Parker referenced, and there is no indication that the Zardari government has followed the Musharraf government's practice of arbitrarily arresting members of the PML-N. And even if the Zardari government were to target Sharif's followers, it is not clear why the government would target Mustafa, someone who participated in an investigation against Rehman under the Musharraf government.

Relatedly, Mustafa argues that if he were to return to Pakistan, the Zardari government would single him out for his prior close association with Rehman and knowledge of Rehman's financial affairs and force him, under threat of arrest, to cooperate in an investigation against Rehman. He contends that his prior experience with the Musharraf government demonstrates the likelihood that he would be targeted by the Zardari government as a source of information. But Mustafa also explains that President Zardari holds Rehman responsible for having imprisoned him under harsh conditions and for an alleged assassination attempt against Zardari that occurred while he was in the custody of the Sharif government. He does not articulate why the Zardari government would be interested in

Mustafa's knowledge of Rehman's financial affairs in the context of a murder investigation and does not allege that he has any special knowledge of Rehman's treatment of Zardari. The conclusion that Mustafa did not articulate a well-founded fear of persecution by President Zardari and his government is thus supported by the evidence in the record.

On remand, the Board should therefore focus its attention on Mustafa's fear of persecution by Rehman and his associates.

### III.  Conclusion

For the foregoing reasons, we GRANT Mustafa's petition for review and REMAND to the Board for further proceedings consistent with this opinion.