In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1989

JOHANA CECE,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A096 158 857

ARGUED OCTOBER 5, 2011 — DECIDED FEBRUARY 6, 2012

REARGUED EN BANC SEPTEMBER 27, 2012

DECIDED AUGUST 9, 2013

Before EASTERBROOK, *Chief Judge,* and POSNER, FLAUM,
MANION, KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER,
and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge*. United States asylum laws grant refuge to those who have been persecuted in foreign lands because of race, religion, nationality, membership in a particular social group, or political opinion. The complexity surfaces when we try to define terms such as persecution and "social group"—the latter of which has perplexed this court and others, and is in the spotlight once again in this case.

## I.

Johana Cece, a native of Albania, arrived in the United States in 2002, and sought asylum within the requisite time allotted. The immigration judge deemed Cece credible, and therefore we use her testimony and the immigration judge's factual findings as a basis to set forth the facts of the case.

Cece lived with her family in Korçë, Albania until her parents left the country in 2001. As a young woman living alone in Albania, Cece caught the attention of a well-known local criminal gang that was notorious for forcing women into prostitution rings. One of the leaders of that gang, a man Cece knew as "Reqi," began following her around town, offering her rides, and inviting her on dates. Cece knew Reqi by reputation—that is, for his membership in a gang known for its participation in prostitution rings, murder of other gang members, and the drug trade. Cece also testified that the gang members appeared to enjoy complete immunity from the law. Cece had long seen Reqi near her high school, where he cruised the area looking for girls and offering drugs to young women. Cece had heard that one of these women had been kidnapped by Reqi and forced into prostitution. Reqi's stalking culminated in a confrontation on June 4, 2001, when Reqi followed Cece into a cosmetics store, cornered her, and pinned her to a wall. There he confronted

her and asked her why she would not go out with him. Reqi made it clear to Cece that he could not be stopped and that he would find her and do whatever he wanted to her. She told him to let go, but he merely tightened his grip and held her there. There were several people in the store, but no one came to her aid. Cece surmised that they too were frightened by Reqi. Cece's friend convinced her to report the assault to the police, but the police perfunctorily dismissed her accusation, claiming she lacked proof.

A few days later someone threw a rock through Cece's window. She stopped going out, stopped going to school, and made plans to leave Korçë.

Cece moved 120 miles north to Tirana to stay with her sister, who lived in a university dormitory, but her safety there was short-lived. A year later, her sister left the country and, without access to the dormitory or family with whom to live, Cece was once again left alone to fend for herself. As a single woman living alone in Albania, Cece claims she remained a target no matter where she lived.

In 2002, fearing for her safety, Cece fraudulently procured an Italian passport and came to the United States under the Visa Waiver Program. Less than a year later, she applied for asylum and withholding of removal, asserting that she feared returning to Albania because she believed that as a young woman living alone she would be kidnapped and forced to join a prostitution ring.

At Cece's hearing, Dr. Bernd Fischer, a Professor in Balkan History at the Indiana University–Purdue University Fort Wayne and an expert on Albania, testified that Cece's

experience was "unfortunately usual." (R. 223). Dr. Fischer described a very serious problem of human trafficking for prostitution in Albania in which gangs, often with the protection, and at times the participation of the police, kidnap women and spirit them out of the country either through Greece, Kosova, or across the Adriatic Sea to Italy. Dr. Fischer described how anomalous it is for a single woman to live by herself in Albania, that such a woman would be an ideal target for a trafficker, particularly if she had been such a target in the past, and that the problem was pervasive throughout Albania and not limited to Cece's home village of Korçë. Dr. Fischer testified that although gang members primarily target women between the ages of sixteen and twenty-six, many women outside of the target age range are also forced into prostitution. Finally, he noted that the Albanian judicial system does not adequately enforce laws against traffickers. Reports issued by the U.S. State Department in 2004 corroborated his representations of a large-scale problem with human trafficking in Albania. (R. 573-84).

The immigration judge granted Cece asylum in 2006, concluding that she belonged to the group of "young women who are targeted for prostitution by traffickers in Albania," and that the Albanian government was unwilling or unable to protect such women. (R. 128-29). He noted in particular that Albania stands out in Europe as a major country of origin of traffickers in prostitution; the government's judicial system is not effective against the problem; Albania suffers from a major and ongoing trafficking of young women by gangs; and there is no prospect in the foreseeable future of the government being able or willing to address the prob-

lem. (R. 129). The immigration judge also found Cece's testimony credible and her fear reasonable.

The Board of Immigration Appeals vacated the decision of the immigration judge, however, finding that Cece failed to establish past persecution and had successfully relocated within Albania. (R. 330-31). Specifically, the Board held that the immigration judge erred in determining that Cece was a member of a social group of young women who have been targeted for prostitution by traffickers, noting its precedent that a social group must have social visibility and share a narrowing characteristic other than the risk of being persecuted.

On remand, the immigration judge expressed concern with the Board's conclusion that Cece did not belong to a protectable social group and that she could safely relocate within the country. (R. 114-116, 119-120). The immigration judge, however, recognized that he was bound by the Board's determinations and denied the application for asylum. The Board dismissed Cece's second appeal, emphasizing that Cece's proposed group was defined in large part by the harm inflicted on its members and did not exist independently of the traffickers.[1] The Board also concluded that

---

[1] The Board appropriately abandoned its criticism that Cece had failed to demonstrate "social visibility." Between the time of the first and second Board appeals, this Court rejected a social visibility analysis and concluded that applicants need not show that they would be *recognized* as members of a social group to qualify for withholding. *See Gatimi v. Holder*, 578 F.3d 611, 614-15 (7th Cir. 2009) (noting that homosexuals might well pass as heterosexual, and women who have not yet undergone genital mutilation look no different than other women).

there was insufficient evidence in the record that internal re-location was not reasonable. (R. 9).

Cece appealed to this Court and over one dissent, the panel denied Cece's petition for review, agreeing with the Board that Cece had not named a cognizable social group and that the Board had sufficient evidence to conclude that Cece could relocate safely within Albania. We granted Cece's petition for rehearing en banc and vacated the panel's opinion and judgment.

## II.

To be eligible for asylum, an applicant must show that she is "unable or unwilling to return" to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §1101(a)(42)(A). An applicant who successfully proves that she was subject to past persecution is presumed to have a well-founded fear of future persecution, which the Attorney General can rebut by demonstrating a change in conditions in the applicant's home country. 8 C.F.R. § 1208.13(b)(1); *Mustafa v. Holder*, 707 F.3d 743, 750-751 (7th Cir. 2013). The applicant must show that she fits within one of those categories and that there is "a nexus between her fear of future persecution and one of those five protected grounds." *Escobar v. Holder*, 657 F.3d 537, 542 (7th Cir. 2011); *Ishitiaq v. Holder*, 578 F.3d 712, 715 (7th Cir. 2009).

The primary question in this case is whether Cece has proffered a particular social group that is cognizable under 8 U.S.C. § 1101(a)(42)(A). Whether a group constitutes a par-

ticular social group under the Immigration and Nationality
Act is a question of law that we review *de novo*, while giving
*Chevron* deference to the Board's reasonable interpretation
set forth in precedential opinions interpreting the statute.
*Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467
U.S. 837, 842-43 (1984); *Escobar*, 657 F.3d at 542. *See also*, *Ayala
v. Holder*, 640 F.3d 1095, 1096-97 (9th Cir. 2011) (whether a
group constitutes a particular social group under the Immi-
gration and Nationality Act is a question of law, which a
court of appeals reviews de novo); *Castaneda-Castillo v. Hold-
er*, 638 F.3d 354, 363 (1st Cir. 2011) (same); *Crespin-Valladares
v. Holder*, 632 F.3d 117, 124 (4th Cir. 2011) (same); *Gomez-
Zuluaga v. Att'y Gen. of United States*, 527 F.3d 330, 339 (3d
Cir. 2008) (same); *Malonga v. Mukasey*, 546 F.3d 546, 553 (8th
Cir. 2008) (same); *Castillo-Arias v. United States. Att'y Gen.*,
446 F.3d 1190, 1195 (11th Cir. 2006) (same); *Cruz-Funez v.
Gonzales*, 406 F.3d 1187, 1191 (10th Cir. 2005) (same).

Under the deference analysis set forth in *Chevron*, if con-
gressional purpose is clear, we must give it effect. *Chevron*,
467 U.S. at 842-43. We also give deference to precedential
decisions of the Board. *Id.* at 843; *Escobar*, 657 F.3d at 542.
Our duty at this stage is to uphold the Board's determination
if it is supported by substantial evidence—that is, reasona-
ble, substantial, and probative evidence on the record con-
sidered as a whole. *Escobar*, 657 F.3d at 545. If Congress has
directly spoken to the precise question at issue, then a court
must follow that clear guidance. *Chevron*, 467 U.S. at 842-43.
If, however, the statute is silent or ambiguous, the court
must defer to authoritative agency interpretations of the law.
*Id.* at 844. Congress did not directly address what it meant

by a protected "social group" in the Immigration and Nationality Act, so we look to see how the agency has interpreted the statute.

The Board took on the task of defining "social group" in *Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (1985), *overruled, in part, on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439, 439 (BIA 1987) limiting it to groups whose membership is defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be required to change. *Id*. This Circuit has deferred to the Board's *Acosta* formulation of social group. *See Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998).

The immutable or fundamental characteristic might be membership in an extended family, sexual orientation, a former association with a controversial group, or membership in a group whose ideas or practices run counter to the cultural or social convention of the country. The latter group might seem plausibly alterable, but we respect an individual's right to maintain characteristics that are "fundamental to their individual identities." *Escobar*, 657 F.3d at 545. Cece could find a man to marry to protect her (and anachronistically, the lawyer representing the government in this case inquired why she had not done just that (R. 172)), but this is the type of fundamental characteristic change that we do not ask of asylum applicants. *See, e.g.*, *Agbor v. Gonzales*, 487 F.3d 499, 502 (7th Cir. 2007) (women who are opposed to and fear female genital mutilation); *Sarhan v. Holder*, 658 F.3d 649, 654 (7th Cir. 2011) (women who "in accordance with social and religious norms in Jordan, are accused of being immoral criminals and, as a consequence, face the prospect of being

killed without any protection from the Jordanian govern-ment."); and *Yadegar-Sargis v. INS,* 297 F.3d 596, 603 (7th Cir. 2002) (Christian women in Iran who do not wish to adhere to the Islamic female dress code). *See also Al-Ghorbani v. Holder,* 585 F.3d 980, 996 (6th Cir. 2009) (social group that opposes the repressive and discriminatory Yemeni cultural and religious customs that prohibit mixed-class marriages and require paternal consent for marriage); *Safaie v. INS,* 25 F.3d 636, 640 (8th Cir. 1994) (Iranian women who advocate women's rights or who oppose Iranian customs relating to dress and behavior);[2] *Fatin v. INS,* 12 F.3d 1233, 1241 (3d Cir. 1993) (Iranian women who refuse to conform to the govern-ment's gender-specific laws and social norms).

Members of a social group need not be swimming against the stream of an embedded cultural norm. Some-times the characteristic is immutable because a shared past experience or status has imparted some knowledge or label-ing that cannot be undone. *Acosta,* 19 I. & N. Dec. at 233. Thus we have held that former truckers (or, more generally, those with a special skill needed by the persecutors) consti-tute a social group because their past actions and acquisition of skills are unchangeable, *Escobar,* 657 F.3d at 545-46; as do the subordinates of the attorney general of Colombia who had information about insurgents plaguing that nation, *Sepulveda v. Gonzales,* 464 F.3d 770, 771-72 (7th Cir. 2006); former members of a violent and criminal faction in Kenya, *Gatimi v. Holder,* 578 F.3d 611, 614 (7th Cir. 2009); tattooed,

[2] Both *Al-Ghorbani* and *Safaie, supra,* have been *superseded on other grounds by statute,* 8 U.S.C. § 1252(b)(3)(B), *as recognized in Rife v. Ashcroft,* 374 F.3d 606, 614-15 (8th Cir. 2004).

former Salvadoran gang members who had since turned to God, *Benitez Ramos v. Holder*, 589 F.3d 426, 428-29 (7th Cir. 2009); parents of Burmese student dissidents, *Lwin*, 144 F.3d at 512; and the educated, landowning class of cattle farmers targeted by Columbian rebels, *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005). *See also Lukwago v. Ashcroft*, 329 F.3d 157, 178 (3d Cir. 2003) (former Ugandan child soldiers who have escaped abduction, enslavement and torture).

In order to compare Cece's social group with the likes of those above, we must first determine the contours of her social group. Both the parties and the immigration courts were inconsistent, and the description of her social group varied from one iteration to the next. The inconsistencies, however, do not upset the claim. *See In re Kasinga,* 21 I. & N. Dec. 357, (BIA 1996) (the Board, recognizing that both the Immigration and Naturalization Service and the applicant "advanced several formulations of the 'particular social group' at issue"). And in one form or another, both Cece and the immigration judge articulated the parameters of the relevant social group.

On her application for asylum, Cece explains that she is a "perfect target" of forced prostitution because she is a "young Orthodox woman living alone in Albania." (R. 669). The immigration judge, in initially granting Cece asylum, collapsed this definition and described her social group as first, "a social group consisting of young women who are targeted for prostitution by traffickers in Albania," (R. 128) and then a "social group consisting of women in danger of being trafficked as prostitutes." (R. 131). Thus the immigra-

tion judge omitted the important characteristic that Cece lived alone.[3] There is no doubt that it should have been included in the immigration judge's description of social group, as so much of the testimony before him centered on Cece's status as a woman living alone. Cece testified at length that women do not live alone in Albania (R. 147-148, 167, 195, 674), that she did not know anyone who lived alone (R. 167, 173,195, 207); that she was afraid to live alone, (167, 171, 197, 300, 674) and most importantly that she was targeted because she was living alone. *See* (R. 147-148, 158, 166, 172-73, 195, 197, 300, 304, 305). Similarly, the Albanian expert's testimony was focused on the risk of women who lived alone in Albania. (R. 229-30). Cece's brief before this Court noted several times that the Board failed to consider this formulation of the group. Opening Brief of Appellants before the three-judge panel of this Court, at 20, 22, 27.

We could surmise that the immigration judge's description of Cece's social group as one consisting of "young women who are targeted for prostitution by traffickers in Albania," (R. 128) or "women in danger of being trafficked as prostitutes," (R. 131) was simply shorthand for describing women who are vulnerable to trafficking. And we know that women in Albania become vulnerable to targeting when, for example, they lack protection from husbands and family members. We need not do too much surmising, however,

---

[3] Occasionally the adjudicators or parties refer to Cece as "single," which appears, in this context, to be shorthand for living alone, *see* Opening Brief of Appellants before the three-judge panel of this Court, at 20, 22, 27, 28 (contending that Cece is member of a group of "young, single, women in Albania.")

because the immigration judge's order on remand—and really the only order that matters on this appeal—specifically concludes that her characteristics are "namely that she is a young woman from a minority religion *who has lived by herself* most of the time in Albania, and thus is vulnerable, particularly vulnerable to traffickers for this reason." (R. 120) (emphasis ours).[4]

The Board's order rejects Cece's social group as being not cognizable under the Act because it "is defined in large part by the harm inflicted on the group, and does not exist independently of the traffickers." (R. 9). This is not a reasoned conclusion. As we have just described, the characteristics of the group consist of the immutable or fundamental traits of being young, female, and living alone in Albania. Even if the group were defined in part by the fact of persecution (and we do not believe it to be), that factor would not defeat recognition of the social group under the Act. Although it is true that "where a proposed group is defined *only* by the characteristic that it is persecuted, it does not qualify as a 'social group,'" the Board of Immigration Appeals has never required complete independence of any relationship to the

---

[4] The immigration judge's decision on remand is the only one which we review, as the former has been vacated. We refer to the earlier decision only to determine how Cece's social group has been articulated throughout the litigation. Our review then is of the immigration judge's second opinion of December 1, 2008, as supplemented by the Board's opinion of March 31, 2011 dismissing her appeal. *See Barma v. Holder*, 640 F.3d 749, 751 (7th Cir. 2011) ("Where, as here, the BIA agrees with the IJ's decision but supplements that decision with its own explanation for rejecting the appeal, we review the IJ's decision as supplemented by the BIA's reasoning.").

persecutor. *Escobar*, 657 F.3d at 545 (emphasis ours). And just because all members of a group suffer persecution, does not mean that this characteristic is the only one that links them. *Id*. at 545-46. A social group "cannot be defined *merely* by the fact of persecution" or "*solely* by the shared characteristic of facing dangers in retaliation for actions they took against alleged persecutors." *Jonaitiene v. Holder*, 660 F.3d 267, 271-72 (7th Cir. 2011) (emphasis ours). That shared trait, however, does not disqualify an otherwise valid social group. *Escobar*, 657 F.3d at 547 (instructing that we cannot tease out one component of the group's characteristics to defeat the definition of social group). It certainly did not invalidate the social group in *Agbor* which consisted of "women who fear being circumcised should they return to their home countries," despite the fact that the group was defined in large part by the persecution inflicted on the group. *Agbor*, 487 F.3d at 502. Nor did it disqualify "women in Jordan who have (allegedly) flouted repressive moral norms, and thus who face a high risk of honor killing." *Sarhan*, 658 F.3d at 654, 655. These women still had the immutable characteristics of gender, nationality, and the inability to alter their past labels of nonconformist.

"Women who fear female genital circumcision" sound a lot like "women who fear prostitution," thus demonstrating that it is not fair to conclude that the group is defined by the harm or potential harm inflicted merely by the language used rather than determining what underlying characteristics account for the fear and vulnerability. The Board's cases instruct that we must look to see whether the group shares "common characteristics that members of the group either

cannot change, or should not be required to change, because such characteristics are fundamental to their individual identities." *Escobar*, 657 F.3d at 545 (citing *Gatimi*, 578 F.3d at 614, *In re Kasinga*, 21 I. & N. Dec. 357, 365-66 (BIA 1996)). In this case, although it is true that these women are linked by the persecution they suffer—being targeted for prostitution—they are also united by the common and immutable characteristic of being (1) young, (2) Albanian, (3) women, (4) living alone. For this reason we disagree with the Sixth Circuit's conclusion in *Rreshpja v. Gonzales*, that the social group of "young (or those who appear to be young), attractive Albanian women who are forced into prostitution" does not constitute a social group because it is circularly defined by the fact that it suffers persecution. *Id.* 420 F.3d 551, 555-56 (6th Cir. 2005).[5]

Our conclusion is consistent with a parallel line of reasoning found in mixed motive cases. The Board of Immigration Appeals and this Court have long recognized that persecution can exist in a mixed motive case in which the persecutor targets an individual for more than one reason and one of the reasons does not warrant protection under the Act. Under the mixed-motives doctrine, an applicant may qualify for asylum so long as the applicant demonstrates by either direct or circumstantial evidence that his persecutors were motivated, at least in part, by one of the enumerated

---

[5] The Second Circuit has also addressed a similar issue in *Gjura v. Holder*, 502 Fed. App'x 91 (2d Cir. 2012), but in that case the court skirted the issue of whether "young, unmarried Albanian women could constitute a social group" and found instead that the applicant, Gjura, had failed to establish a nexus. *Id.*

grounds. *Mustafa v. Holder*, 707 F.3d 743, 751 (7th Cir. 2013).[6] *See also Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011) ("[A]n individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act.").

Suppose, for example, that Muslims in a particular country are wildly disfavored and frequently persecuted by the government. Wealthy Muslims, however, are tolerated because of their vast contribution to the poor country's business, tax base and overall wealth. The government, on the other hand, routinely beats, jails and strips of rights poor Muslims. Although the United States does not grant asylum based on poverty, the fact that the persecuted group shares this common characteristic does not disqualify the group from seeking asylum based on religious persecution. We cannot tease out one component of a group's characteristics to defeat the definition of social group. *Escobar*, 657 F.3d at 547.

Both dissents submit that Cece is not in the group of young Albanian women living alone because her own expert

---

[6] The REAL ID Act of 2005 now requires an applicant to show that one of the five protected grounds was at least one "central reason" for his persecution. *See* 8 U.S.C. § 1158(b)(1)(B)(i). Cece filed her asylum claim in 2002, thus pre-REAL ID standards and case law apply. *See Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005). In any event, the "central reason" for her persecution is that she was a young woman living alone, and as such she would qualify even under the Real ID Act as the ground need only be "central." A ground may be a secondary (or tertiary, etc.) reason and still justify asylum provided the applicant can show that the protected status played more than a minor role in motivating a persecutor. *Shaikh v. Holder*, 702 F.3d 897, 902 (7th Cir. 2012).

defined "young" as 16 to 26 or 27, and Cece is now 34. He testified, however, that "this is just a targeted age group. There are many examples of people outside of the targeted age group being kidnapped and trafficked." (R. 255). In this case, the Petitioner is part of a group of young Albanian women who live alone. Neither their age, gender, nationality, or living situation are alterable. These characteristics qualify Cece's proposed group as a protectable social group under asylum law.

Demonstrating that an asylum applicant belongs to a cognizable social group is only the first step in determining asylum. Recall that an applicant must show not only that she fits within a cognizable social group but also that there is a nexus between the persecution and the membership in the social group. *Escobar*, 657 F.3d at 542; *Ishitiaq*, 578 F.3d at 715. Justice Alito, while on the Third Circuit, described the steps as follows:

> The alien must (1) identify a group that constitutes a 'particular social group' within the interpretation just discussed, (2) establish that he or she is a member of that group, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that membership.

*Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993). He then went on to note that, "to the extent that the petitioner in this case suggests that she would be persecuted or has a well-founded fear that she would be persecuted in Iran simply because she is a woman, she has satisfied the first of the three elements that we have noted." *Id.* As we are about to see, it is the nexus requirement where the rubber meets the road.

Those who fear that the slope leading to asylum has been made too slick by broad categories need not worry. The importance of the "on account of" language must not be overlooked. It is this requirement that should assuage Judge Easterbrook's fears that "[t]his makes eligible for asylum everyone who faces a substantial risk of harm in his native land, no matter the reason." *Post* at 32. Although the category of protected persons may be large, the number of those who can demonstrate the required nexus likely is not. As the Board explained of clan-based persecution in Somalia, "the fact that almost all Somalis can claim clan membership and that interclan conflict is prevalent should not create undue concern that virtually all Somalis would qualify for refugee status, as an applicant must establish he is being persecuted on account of that membership." *In re H-*, 21 I. & N. Dec. 337, 343 (BIA 1996). The breadth of the social group says nothing about the requirements for asylum, just as the breadth of categories under Title VII of the Civil Rights Act says nothing about who is eligible to sue an employer for discrimination. All African Americans and all women, for example, are members of "protected" categories under Title VII, but not all African Americans and women have a claim for discrimination. In order to be entitled to asylum, Cece must be able to demonstrate a particular link between her mistreatment and her membership in the stated social group. *Escobar*, 657 F.3d at 544; *Bueso-Avila*, 663 F.3d at 936. This requirement is not unique to inquiries about persecution based on "social group," but rather one that is applicable to cases of claimed persecution based on race, religion, nationality or political opinion. In other words, an ethnic Rom (gypsy) who has been mistreated by the town mayor because of a long-

standing business dispute would not be eligible for asylum even if the mayor has undoubtedly and unfairly mistreated him, and even if he belongs to an ethnic group that was frequently the target of persecution in his country. The persecution must still be "on account of" the protected category.

In any event, the breadth of category has never been a per se bar to protected status. As we noted in *Iao v. Gonzales*,

> The number of followers of Falun Gong in China is estimated to be in the tens of millions, all of them subject to persecution … . [Because] [a]nyone, we suppose, can get hold of a book of [Falun Gong] teachings, start doing the exercises, and truthfully declare himself or herself a bona fide adherent to Falun Gong [,][t]he implications for potential Chinese immigration to the United States may be significant … . But Congress has not authorized the immigration services to [control Chinese immigration] by denying asylum applications in unreasoned decisions.

*Iao v. Gonzales*, 400 F.3d 530, 533 (7th Cir. 2005). Many of the groups recognized by the Board and courts are indeed quite broad. These include: women in tribes that practice female genital mutilation; *Matter of Kasinga*, 21 I. & N. Dec. at 365, *Agbor*, 487 F.3d at 502; persons who are opposed to involuntary sterilization, 8 U.S.C. § 1101(a)(42)(B); *Chen v. Holder*, 604 F.3d 324, 332 (7th Cir. 2010); members of the Darood clan and Marehan subclan in Somalia, *In re H–*, 21 I. & N. Dec. at 340, 343 (1% of the population of Somalia are members of the Marehan subclan); homosexuals in Cuba, *In re Toboso–Alfonso,* 20 I. & N. Dec. 819, 822-23 (BIA 1990); Filipinos of Chinese ancestry living in the Philippines, *Matter of V–T–S–,*

21 I. & N. Dec. 792, 798 (BIA 1997) (approximately 1.5% of the Philippines population has an identifiable Chinese background); *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir. 1996) (rejecting the notion that an applicant is ineligible for asylum merely because all members of a persecuted group might be eligible for asylum). The ethnic Tutsis of Rawanda numbered close to 700,000 before the genocide of 1994, and yet a Tutsi singled out for murder who managed to escape to the United States could surely qualify for asylum in this country. And undoubtedly any of the six million Jews ultimately killed in concentration camps in Nazi-controlled Europe could have made valid claims for asylum, if only they had had that opportunity.[7] Many of our asylum laws originated out of a need to address just such refugees from World War II. It would be antithetical to asylum law to deny refuge to a group of persecuted individuals who have valid claims merely because too many have valid claims. *See Iao,* 400 F.3d at 533; *Singh*, 94 F.3d at 1359. For this reason we also reject the Sixth Circuit's reasoning that the group of young-looking, attractive Albanian women who are forced into prostitution is not a cognizable social group because it is too broad and sweeping of a classification. *Rreshpja*, 420 F.3d at 555.

---

[7] Although some Jews might have had the opportunity to seek asylum in the United States, having escaped Germany on the M.S. St. Louis, they were ultimately denied entry into the United States. The ship was forced to return to Europe where 254 of the 937 refugees seeking asylum from the Nazis were eventually killed in concentration camps. S.Res. 111, 111th Cong. (2009).

The safeguard against potentially innumerable asylum claims is found in the stringent statutory requirements for all asylum seekers which require that the applicant prove (1) that she has suffered or has a well-founded fear of suffering harm that rises to the level of persecution, (2) on account of race, religion, nationality, membership in a particular social group, or political opinion, and (3) is unable or unwilling to return to her country because of the persecution or a well-founded fear of persecution. 8 U.S.C. §1101(a)(42)(A), 1158(b)(1); *Bejko v. Gonzales*, 468 F.3d 482, 484 (7th Cir. 2006).

Judge Easterbrook's dissent argues that "[w]hatever risk Cece faces comes from criminals, not from the government." *Post* at 29. Of course "persecution does not include the actions of private citizens unless the government is complicit in those acts or is unable or unwilling to take steps to prevent them." *Bitsin v. Holder*, No. 12-2717, 2013 WL 2402855, *6 (7th Cir. May 31, 2013). In his initial determination, the immigration judge found that Albania was unable or unwilling to protect Cece from third party traffickers, (R. 129, 131). In its decision overturning the immigration judge, the Board said only that "there is no indication that the government of Albania was involved in the incident described by the applicant, nor that such government is interested in harming the applicant. (R. 330). The first proposition is simply wrong. Cece complained to the police, but they refused to take any action. More importantly, the standard is not just whether the government of Albania was involved in the incident or interested in harming Cece, but also whether it was unable or unwilling to take steps to prevent the harm. *Bitsin v.*

*Holder*, 2013 WL 2402855 at \*6. On remand, the immigration judge acknowledged his obligation to follow the Board's determination regarding the proposed social group, but still noted his finding that Cece could not depend upon the police to protect her from traffickers. (R. 115-116). The Board had nothing further to say about the matter. When the Board agrees with the decision of the immigration judge, adopts that decision and supplements that decision with its own reasoning, as it did here, we review the immigration judge's decision as supplemented by the Board. *Mustafa v. Holder*, 707 F.3d 743, 750 (7th Cir. 2013) (citing *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011)); *Barma*, 640 F.3d at 751. In this case the Board based its denial of asylum on the fact that first, Cece did not belong to a cognizable social group and second, she would have been able to relocate safely within Albania. The Board therefore had no need to address the immigration judge's factual finding that the police were unable or unwilling to prevent the harm. Judge Easterbrook opines that the Board must be at liberty to consider this subject on remand. Whether or not the Board could consider (or reconsider) this matter on remand, however, this court is certainly entitled to (and indeed obligated to) review the decision of the immigration judge as supplemented by the BIA's reasoning. *Jonaitiene*, 660 F.3d at 270. We review agency findings of fact for "substantial evidence" and may reverse the Immigration Judge's determinations "only if we determine that the evidence *compels* a different result." *FH–T v. Holder*, No. 12-2471, 2013 WL 3800252, \* 3 (7th Cir. July 23, 2013). Judge Easterbrook's conclusion that Cece faced no "mistreatment at public hands" is contrary to the only factual finding on the matter. In any event, the entirety of the

discussion is unnecessary, as the Board based its decision on the fact that Cece's proposed social group was not cognizable under the act—a holding with which we disagree.

Circling back to our level of deference, now with a clear understanding of the Board's definition of social group derived from *Acosta*, we must uphold the Board's determination if it is "a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best." *Holder v. Martinez-Gutierrez*, 132 S. Ct. 2011, 2017 (2012) (citing *Chevron U.S.A. Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 843-844, and n. 11(1984)); *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002). The problem here is that the Board's decision is inconsistent with its decisions in other similar cases. Cece's social group is not different than many of the groups approved by the BIA. For example, she is not unlike the women in *Kasinga, supra,* 21 I. & N. Dec. at 365-66 who were young women in a tribe that practices female genital mutilation. In both cases the broad immutable group that triggered social group status—young women in particular tribes in Kasinga's case, and young women in Albania, in Cece's case—could be narrowed by other changeable but fundamental characteristics—living alone in Cece's case, and having not yet been subjected to female genital mutilation in Kasinga's case. Nor is Cece unlike the Jordanian women who face "honor killings" because of the social and religious norms in Jordan, *Sarhan*, 658 F.3d at 654, or Christian women in Iran who do not wish to adhere to the Islamic female dress code. *Yadegar-Sargis,* 297 F.3d at 603.

In other words the social group is defined by gender plus one or more narrowing characteristics. Although some courts have toyed with the idea that gender alone can form the basis of a social group, we need not decide that today. *See, e.g., Perdomo v. Holder*, 611 F.3d 662, 667 (9th Cir. 2010) ("Thus, we clearly acknowledged that women in a particular country, regardless of ethnicity or clan membership, could form a particular social group"); *Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) ("Somali females" constitute a particular social group); *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (Iranian women meet the social group definition). *See also In re A–T–*, 24 I. & N. Dec. 296, 304 ("gender is an immutable trait that is generally recognizable"), *vacated and remanded,* Matter of A–T–, 24 I. & N. Dec. 617, Interim Decision 3622, 2008 WL 4306933 (BIA Sep 22, 2008). Although nonbinding, the agency's own "Gender Guidelines," which provide Asylum Officers with guidance on adjudicating women's claims of asylum, provide a helpful understanding by noting that gender is an immutable trait that can qualify under the rubric of "particular social group." United States Bureau of Citizenship and Immigration Services, *Considerations for Asylum Officers Adjudicating Asylum Claims from Women ("INS Gender Guidelines")*, 26 May 1995, available at: http://www.unhcr.org/refworld/docid/3ae6b31e7.html [accessed July 25, 2013]. And the Office of the United Nations High Commissioner for Refugees (again, not authoritative, but informative) has made clear that "women may constitute a particular social group under certain circumstances based on the common characteristic of sex, whether or not they associate with one another based on that shared characteristic." UNHCR, *Guidelines on International Protection: Member-*

*ship of a Particular Social Group,* at 4 (HCR/GIP/02/02, 7 May 2002).

Because Cece's group cannot be distinguished from others with immutable and fundamental traits, the Board's decision is inconsistent with its own precedent.

> When an administrative agency's decisions are inconsistent, a court cannot pick one of the inconsistent lines and defer to that one, unless only one is within the scope of the agency's discretion to interpret the statutes it enforces or to make policy as Congress's delegate … . Such picking and choosing would condone arbitrariness and usurp the agency's responsibilities.

*Gatimi*, 578 F.3d at 616 (internal citations omitted). In this case, the Board has offered no explanation for why Cece's group is not cognizable under the test the Board has adopted in *Acosta. Sepulveda v. Gonzales*, 464 F.3d 770, 772 (7th Cir. 2006). Or, more specifically, why being a young woman living alone in Albania does not qualify as a social group when the attributes are immutable or fundamental. The issue of whether a particular social group is cognizable is a question of law on which the Board erred. *Escobar*, 657 F.3d at 542. *See also*, *Ayala*, 640 F.3d at 1096-97; *Castaneda-Castillo*, 638 F.3d at 363; *Crespin-Valladares*, 632 F.3d at 124; *Gomez-Zuluaga*, 527 F.3d at 339; *Malonga*, 546 F.3d at 553; *Castillo-Arias*, 446 F.3d at 1195; *Cruz-Funez*, 406 F.3d at 1191. The Board's decision cannot stand and must be reconsidered on remand: Cece has established that she belongs to a cognizable social group.

We are well aware of the limits of our review set forth in *Gonzales v. Thomas*, 547 U.S. 183, 185-86 (2006) (*per curium*) and *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) (*per curium*). An appellate court errs by deciding in the first instance, without giving the Board the first opportunity on remand, whether a proposed social group is cognizable within the meaning of the Act. *Id.* The judge and Board had before them all of the facts pertaining to Cece's proposed social group and yet determined that her social group was not cognizable under the Act. This was error in light of the Board's own precedent in *Acosta*.

## III.

The Board also found that there was insufficient evidence in the record that internal relocation was not a feasible means of avoiding the persecution of which Cece complains. The Board, however, ignored the fact, emphasized throughout the hearing and appeals, that Cece had lived safely in Tirana only while living with her sister in her sister's university dormitory. Once her sister left Tirana and Cece had to move from the dormitory, she was again at risk. (R. 168-172). The Albanian expert testified at length that Albania was a small country and that it would be difficult to hide anywhere. (R. 231). Even in the big city of Tirana, people tended to live in family or clan groupings, and a young single woman living alone would stick out as an anomaly. *Id.* The expert also surmised that Cece faced an increased risk of being targeted simply because of her previous status as a target, i.e. she was already known to traffickers. (R. 229, 230, 257). The immigration judge acknowledged the expert's testimony on these facts and was troubled by the Board's conclusion that

Cece could move safely within Albania notwithstanding the facts that "she is a young woman from a minority religion who has lived by herself most of the time in Albania, and thus is vulnerable, particularly vulnerable to traffickers for those reasons." (R. 120). The immigration judge then concluded, "I do not agree with the Board's conclusion, but I am required to follow it." *Id*. The Board, in its order, had but this to say about her ability to relocate: "we once again find that there is insufficient evidence in the record that internal relocation is not reasonable."[8] (R. 9). The Board's decision lacked any discussion or analysis of the issue. Thus the only evidence-based analysis we have is that of the immigration judge whose conclusion is that Cece could *not* safely relocate within Tirana. Nevertheless the Board held that she could. The Board's conclusion is not supported by substantial evidence. *Vahora v. Holder*, 626 F.3d 907, 912-913 (7th Cir. 2010) ("Under the substantial evidence standard, the agency's determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."). Indeed it is not supported by evidence of any kind whatsoever. The only evidence in the record is that Cece felt safe in Tirana only so long as she was not living alone—a status quo that ended as soon as her last family member left the country. An asylum applicant is entitled to a reasoned analysis of her case supported by relevant, proba-

---

[8] In its first order, before remand, the Board simply stated that "the applicant appears to have successfully relocated within Albania. There is insufficient evidence in the record that she has a well-founded fear of persecution in Tirane or in another city within Albania, outside of Korçë … there is no indication that Reqi (or any other trafficker) tried or was motivated to pursue the applicant outside of Korçë." (R. 331).

tive evidence. *Mustafa*, 707 F.3d at 754. A failure to provide such a reasoned analysis requires remand. *Kadia v. Holder*, 557 F.3d 464, 467 (7th Cir. 2009).

We therefore grant the petition for review and remand to the agency for further proceedings consistent with this opinion.

EASTERBROOK, *Chief Judge*, dissenting. Cece defines, as the "social group" at risk of persecution, "young Albanian women in danger of being trafficked as prostitutes." At earlier stages of these proceedings she made different proposals, but this is the definition in her appellate briefs. My colleagues hold that the Board of Immigration Appeals erred by not treating "young Albanian women who live alone" as her social group. Put to one side the fact that Cece does not ask us to define a social group that way. Whether the group is "young Albanian women in danger of being trafficked as prostitutes" or "young Albanian women who live alone", Cece isn't in it. Her own expert defined "young" as 16 to 26 or 27. Cece is 34. The basis for her claim of asylum is future risk; she does not argue that she suffered persecution before leaving Albania, so the fact that she is not a member of her own proposed group should be dispositive. (Perhaps Cece looks younger than her age and would be targeted by mistake, but she does not argue this.)

Then there is the question "how much risk is too much?" Cece's expert did not attempt to quantify the risk that young Albanian women living alone face, nor does the majority. That many of Western Europe's prostitutes are Albanians does not tell us how many are in the sex trade involuntarily. The State Department tries to estimate risk. Its *Human Trafficking Report 2012* finds that 84 complaints about trafficking were made to Albanian public agencies during 2011. *Report* at 64. Nongovernmental groups (NGOs) reported more: they counted 132 Albanian trafficking victims in 2011. *Ibid.* The number of young women living alone in Albania is substantially higher. The State Department ranks nations into four tiers (1, 2, 2 Watch List, and 3), with Tier 1 representing the best performance. *Id.* at 51. Albania is in Tier 2, as are Greece,

Hong Kong, Japan, Switzerland, and more than 60 other na-tions. *Id*. at 52. Fifty-one nations are in tiers 2WL or 3, below Albania. *Ibid*. Deplorable as human trafficking is, any given woman's danger in Albania may be modest.

Whatever risk Cece faces comes from criminals, not from the government, yet "persecution" means mistreatment at public hands. See *Hor v. Gonzales*, 421 F.3d 497 (7th Cir. 2005); *Bitsin v. Holder*, 719 F.3d 619, 628–31 (7th Cir. 2013). Crime may be rampant in Albania, but it is common in the United States too. People are forced into prostitution in Chicago. See, e.g., *United States v. Cephus*, 684 F.3d 703 (7th Cir. 2012). Must Canada grant asylum to young women who fear pros-titution in the United States, or who dread the risk of vio-lence in or near public-housing projects? If there were reason to think the Albanian government in cahoots with the traf-fickers, Cece would have a better case; but when the record shows no more than ineffective law enforcement, there's no basis to infer persecution. *Meghani v. INS*, 236 F.3d 843, 847 (7th Cir. 2001).

I can see why we ought not make anything turn today on the facts that Cece is 34 years old, that the number of traf-ficking victims in Albania may be under 150 annually, and that any risk comes from private criminals rather than public policy: the BIA did not do so, and the *Chenery* doctrine (*SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)) limits reviewing courts to the agency's grounds of decision. Perhaps the Board will consider these issues on remand.

When tackling this subject, the Board may wish to con-sider whether a government's inability to protect people from criminals is a form of persecution. Equating inability to control crime with unwillingness to do so (a form of perse-

cution because it reflects public policy disfavoring a person
or group) first appeared in a decision of the Board in 1964.
See *Matter of Eusaph*, 10 I&N Dec. 453, 454 (1964). The formu-
la has been repeated many times, e.g., *Matter of Pierre*, 15
I&N Dec. 461, 462 (1975); *Matter of Kasinga*, 21 I&N Dec. 357,
365 (1996), without explaining why "unable" has the same
effect as "unwilling"—or quantifying what "unable" means.
The Board appears to be happy with this formula, but its
utility is limited when we do not know how much shortfall
in law enforcement counts as "inability" to protect citizens.

A remand is unnecessary even on the majority's views
about the social-group question, however. The Board found
that Cece could live safely in Tirana, though perhaps not in
her parents' city. Part III of the majority's opinion declares
that this decision is not supported by substantial evidence.
As Judge Manion shows, however, the Board had, and gave,
the best of all possible reasons: that Cece had moved to Tira-
na *and was not followed or accosted there*. Indeed, Cece does not
even *contend* that the person who pursued her in Korçë
learned that she was in Tirana or attempted to locate her (or
anyone else) outside of Korçë. Cece's expert witness testified
that Tirana is a collection of enclaves and that people find
things out; this might have led the Board to conclude that
Cece was at risk there after her sister left. But the inference is
permissive, not compulsory. An agency is entitled to give
more weight to what actually happened than to what could
have happened. Cece's untroubled time in Tirana is "sub-
stantial evidence" for the Board's conclusion. See *INS v. Eli-
as-Zacarias*, 502 U.S. 478, 481 (1992) (if the record allows rea-
sonable disagreement, the Board's decision must stand).

Cece's brief in conjunction with the rehearing *en banc* makes a different argument: that it is not reasonable to require her to relocate to Tirana, even if she would be safe. See 8 C.F.R. §1208.13(b)(2)(ii). According to Cece, the Board should have deemed relocation unreasonable because she had no relatives in Tirana after her sister left. Yet every year millions of persons move to cities where they are strangers; they make new friends (or acquire new relatives) afterward. A person who left Tirana for Rome, and then left Rome for Chicago, is hard pressed to contend that it would not be "reasonable" to think that she could have lived closer to her relatives, even if none was in the neighborhood. (Korçë and Tirana are 110 miles apart.)

Although I think the majority mistaken in its treatment of Cece's specific claim, I am more concerned by its treatment of the Board's doctrine. My colleagues recognize that the statute does not define the term "social group" and that *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), therefore applies to the Board's gap-filling work. See *Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–26 (1999). Yet the dispositions of this and other cases demonstrate that the Seventh Circuit has rejected the Board's approach and established its own—one under which *everyone* belongs to a "social group" and the question whether that membership caused the persecution drops out of consideration. (It drops out because, when the asserted criteria of persecution are used to define the "social group," the process is circular.)

The Immigration and Nationality Act permits federal officials to grant asylum to aliens who seek refuge here "be-

cause of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion". 8 U.S.C. §1101(a)(42)(A). Cece does not contend that her race, nationality, or politics mattered to the traffickers (or to any Albanian public official), and although she initially argued that she was at risk because of her religion she has abandoned that contention. This leaves "social group."

What the Seventh Circuit has done in this and other recent cases is read "because of … membership in a particular social group" in a way that includes everyone threatened by criminals, rebels, or anyone else a nation's government does not control. This makes eligible for asylum everyone who faces a substantial risk of harm in his native land, no matter the reason.

The Board of Immigration Appeals has established, in decisions the court concedes we must respect, several requirements of social-group status. One is that a "social group" entails a characteristic that is either immutable or so important that no one should be required to change it. See *Matter of Acosta*, 19 I&N Dec. 211, 233–34 (1985); *Matter of Kasinga*, 21 I&N Dec. 357, 365–66 (1996). Age changes; that's why decisions such as *Vance v. Bradley*, 440 U.S. 93 (1979), reject arguments that age must be treated like race or sex for legal purposes. Whether a person lives alone also is subject to change. People may marry, live with relatives, or join forces with similarly situated persons. Many single women live with other single women. A group such as "young Albanian women who live alone" therefore flunks the Board's test on multiple grounds, even if we treat marital status as the sort of thing that no one should be required to change.

Another series of cases in this circuit expands the scope of "social group" by a different route. It asks whether the alien used to be at risk. For example, *Escobar v. Holder*, 657 F.3d 537 (7th Cir. 2011), holds that an alien is eligible for asylum as a member of a "social group" that comprises truckers who *ever* opposed a band of Colombian rebels. Events of a decade ago cannot be changed; the past is "immutable"; thus the Board's primary defense against limitless expansion of "social group" vanishes. *Everyone* who seeks asylum in the United States can point to some event in the past, and as the past can't be changed this event becomes the basis for a claim based on an "immutable characteristic." See, e.g., *Sepulveda v. Gonzales*, 464 F.3d 770 (7th Cir. 2006) (former employees of a public agency are a social group); *Benitez Ramos v. Holder*, 589 F.3d 426 (7th Cir. 2009) (former criminal-gang members are a social group).

Some people might be inclined to ask: Why not just treat everyone as belonging to a social group and skip to the question whether persecution occurred? The answer is that the statute makes membership in a group (or classification by race, religion, or politics) essential to analysis of the supposed persecution. The agency must decide whether a person has been persecuted "on account of" membership in the group (or because of politics, race, etc.). You can't sensibly ask about cause without deciding what differentiates the applicant from other persons. To know whether X has been persecuted on account of Y, it is essential to know what Y is. The Board has tried to define groups by fixed attributes (such as "member of the Yoruba tribe" or "born in Korçë"). It is only after defining a group that it becomes possible to ask the statutory question: whether membership in that group is the reason for the adverse treatment.

Cece is a member of one social group that the Board probably would acknowledge: Albanian women. But she does not contend that she fears persecution because of those characteristics. She does not say that the government of Albania persecutes Albanian women. Indeed, she does not contend that Albania discriminates in any way by national origin or sex. She does not maintain that police and courts protect male victims of crime but not female victims; instead she tells us that Albania's system of law enforcement is weak. Failure to achieve optimal deterrence is unfortunate but not "persecution" by any useful understanding. That's why Cece proposed a group such as "young Albanian women in danger of being trafficked as prostitutes." The qualifications that distinguish this proposal from "all Albanian women"—age, living alone, and the criminal enterprise of sex traffickers—all fail the Board's filters.

The BIA has held that a "social group" cannot be identified by asking who was mistreated. *Matter of C– A–*, 23 I&N Dec. 951, 956 (2006). For if the persecutors' acts define social groups, then again §1101(a)(42)(A) effectively offers asylum to all mistreated persons, whether or not race, religion, politics, or some extrinsically defined characteristics (such as tribal membership) account for the persecution. And again this court professes to accept the Board's position—though with the proviso that it applies only when the persecutors' acts are the entire definition (opinion at 12–13, which uses "only" or "solely" or "merely" four times, putting three of the four in italics for emphasis). Thus although the Board concluded that "young Albanian women in danger of being trafficked as prostitutes" flunks, the majority rules otherwise because "danger of being trafficked as prostitutes" is not the *sole* component of the definition. That is not what *Chevron*

requires. We have not applied the Board's definition. We have rewritten it.

Under this court's approach, any person mistreated in his native country can specify a "social group" and then show in circular fashion that the mistreatment occurred because of membership in that ad hoc group. Anyone threatened or injured in the past has an "immutable" characteristic (the past can't be changed), and the selection criteria used by the persecutor (here, people who want to force others into prostitution) become the defining characteristics of the "social group". The structure of §1101(a)(42)(A) unravels.

The majority accuses the Board of inconsistency (opinion at 22–25), but the BIA has been inconsistent by the court's standard, not its own. For example, the "social group" in *Kasinga*, which the court calls "not unlike" Cece's (opinion at 22), was a tribe. The Board sees a big difference between tribal groups (membership is immutable and extrinsic to the choices made by criminals) and "young Albanian women in danger of being trafficked as prostitutes" (defined in part by changeable characteristics and in part by who criminals target). The majority says that it does not see a difference, so the Board must be inconsistent. That's a statement about judicial rejection of the Board's doctrine, not about how the Board administers its own approach.

I grant that some of the inconsistency is real—it has been forced on the Board by judicial refusal to accept its approach to defining "social group." Our court has discarded not only the immutability and don't-use-the-wrongdoers'-perspective rules but also another component of the Board's definition: social visibility. See, e.g., *Gatimi v. Holder*, 578 F.3d 611, 614–15 (7th Cir. 2009); majority opinion at 5 n.1. Other circuits

have allowed the Board to use the "visibility" criterion but have revised or rejected different parts of the Board's definition of "social group." See, e.g., *Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007) (approving the "visibility" standard and adding that changeable attributes such as wealth do not identify a social group); *Castillo-Arias v. Attorney General*, 446 F.3d 1190 (11th Cir. 2006) (denying a petition to set aside the decision in *C– A–*). The Board tries to apply circuit law—and, when it does so, is accused of abandoning its own definition or applying it inconsistently.

The majority says that it accepts the Board's approach. Yet in case after case, of which today's is just a sample, we set aside the Board's decisions. I have already mentioned *Escobar*, *Gatimi*, *Sepulveda*, and *Benitez Ramos*. Here are a few more: *Sarhan v. Holder*, 658 F.3d 649 (7th Cir. 2011); *Torres v. Mukasey*, 551 F.3d 616 (7th Cir. 2008); *Agbor v. Gonzales*, 487 F.3d 499 (7th Cir. 2007); *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666 (7th Cir. 2005); *Yadegar-Sargis v. INS*, 297 F.3d 596 (7th Cir. 2002). The meaning of a legal standard lies in its application to concrete facts. That the BIA and this court regularly reach different decisions on identical facts shows that they are applying different legal standards.

This is a particularly poor case for our court to nix the Board's approach, because at least two other circuits have held that the agency properly denied asylum claims identical to Cece's. The majority concedes (opinion at 14) that its decision conflicts with *Rreshpja v. Gonzales*, 420 F.3d 551, 555–56 (6th Cir. 2005). It also conflicts with *Gjura v. Holder*, 502 Fed. App'x 91 (2d Cir. 2012). The Second Circuit's initial opinion, 695 F.3d 223, held that the Board acted within its discretion in concluding that "young, unmarried Albanian

women" is not a social group. The court then issued a re-
placement opinion denying the petition on the ground that
sex traffickers are private actors whose criminal conduct
does not demonstrate persecution by public officials. Cece
would have lost in the Second Circuit for either of these rea-
sons. As far as I can see this circuit stands alone in disman-
tling the BIA's approach so thoroughly that the agency must
recognize social groups such as "young Albanian women in
danger of being trafficked as prostitutes" or "young Albani-
an women who live alone" and treat members of that group
as victims of persecution.

The majority expresses sympathy for Cece and other ap-
plicants for asylum. Yet the choice whether to be strict or le-
nient belongs to the agency, not to the court. See, e.g., *INS v.
Phinpathya*, 464 U.S. 183 (1984); *INS v. Jong Ha Wang*, 450 U.S.
139 (1981). The Board has chosen to make "social group" do
real work. This court effectively reads it out of the statute
and directs the agency to ask only whether an alien faces a
significant risk for any reason. This intrudes on the sort of
choice Congress has committed to the Executive Branch. The
Attorney General could direct the Board to ditch *Acosta* and
*C– A–*, but as long as the political branches of government
stand by them, *Chevron* requires the judiciary to implement
their choices.

One final observation. Cece entered the United States by
fraud, pretending to be from a nation whose citizens do not
need visas to visit. See *Bayo v. Napolitano*, 593 F.3d 495 (7th
Cir. 2010) (en banc). She started that journey from Rome and
has never contended that she feared sex trafficking in Italy.
Her fraud thus is not mitigated by a need to escape from
danger. The Board has concluded that entering the United

States by fraud, when danger is not imminent, is a strongly adverse factor in the discretionary decision whether to grant asylum. See *Alsagladi v. Gonzales*, 450 F.3d 700 (7th Cir. 2006); *Matter of Pula*, 19 I&N Dec. 467 (1987). Although the court decides today that Cece is *eligible* for asylum, it does not hold that she is *entitled* to it; that question, at least, remains open to decision on remand.

MANION, *Circuit Judge,* with whom EASTERBROOK, *Chief Judge,* joins, dissenting.

I.

After illegally entering the United States using a false Italian passport, Johana Cece sought asylum. To be eligible for asylum, applicants must show that they are "unable or unwilling to return" to the country of their nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

In seeking asylum, Cece claimed she both had suffered past persecution and had a well-founded fear of future persecution. The Board, however, concluded that Cece had not established past persecution, R. 330, and Cece does not challenge that determination on appeal. The Board also concluded that Cece was not entitled to asylum on the basis of a well-founded fear of future persecution because Cece had not "established that she fears persecution based upon one of the protected grounds under the Act." R. 330. The Board further found that "there is [in]sufficient evidence in the record … that internal relocation is not reasonable." R. 331.

The *en banc* court holds that "Cece has established that she belongs to a cognizable social group," Opinion at 24, namely "young Albanian women who live alone." Opinion at 16. And that the immigration judge and Board erred in determining "that her social group was not cognizable under the Act." Opinion at 25. The *en banc* court further holds that the Board's conclusion that Cece could safely relocate in Albania was not

supported by substantial evidence, and grants the petition for review and remands to the agency for further proceedings. Opinion at 26–27.

In holding that "Cece has established that she belongs to a cognizable social group," Opinion at 24, the *en banc* court discusses at length the complexity of defining a "social group." *See* Opinion at 6–25. As discussed below, I have several concerns with the court's analysis. However, even if the *en banc* court is correct that "young Albanian women who live alone," is a "social group" within the meaning of the INA, her petition for review should nonetheless be denied because substantial evidence supports the Board's finding that Cece did not present sufficient evidence that internal relocation is not reasonable. That finding alone dooms Cece's asylum petition and accordingly we should deny Cece's petition for review. I DISSENT.

## II.

### A. Social Group

As the *en banc* court explains, "Congress did not directly address what it meant to be a protected 'social group' in the Immigration and Nationality Act, so we look to see how the agency has interpreted the statue." Opinion at 7–8. The court then notes that the Board defined "social group" in *Matter of Acosta*, 19 I. & N. Dec. 211, 233-34 (1985), to be limited "to groups whose membership is defined by a characteristic that is either immutable or is so fundamental to individual identity or conscience that a person ought not be required to change." Opinion at 8. We have deferred to that definition. Opinion at 8 (citing *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998)).

My first concern with the *en banc* court's holding is that the court's formulation of Cece's social group as "young Albanian women who live alone" does not satisfy the Board's definition of "immutable" or "fundamental" characteristics. There is nothing immutable about "living alone." Nor is "living alone," unlike an individual's choice to be single[1] or married, "so fundamental to individual identity or conscience that a person ought not be required to change." And there are many variations in location and type of dwelling where a woman can choose to live alone.

I also have concerns with the *en banc* court defining a social group with the subjective adjective of "young." A shared characteristic of a "social group," "must provide a clear demarcation, 'permit[ting] an accurate separation of members' from non-members,' … Consequently, loose descriptive phrases that are open-ended and that invite subjective interpretation are not sufficiently particular to describe a protected social group." *Mayorga-Vidal v. Holder*, 675 F.3d 9, 15 (1st Cir. 2012) (quoting *Ahmed v. Holder,* 611 F.3d 90, 94 (1st Cir. 2010).

The use of "young," or for that matter, "middle-aged," or "old," to define a characteristic of a social group is simply too amorphous; there is no clear demarcation of who fits within this social group. *See Larios v. Holder*, 608 F.3d 105, 109 (1st Cir. 2010) ("There are, for example, questions about who may be considered 'young,' … [this is an] ambiguous group characteristic[], largely subjective, that fail to establish a sufficient level

---

[1] The *en banc* court rejected the formulation of young single Albania women in favor of "young Albania women living alone." Opinion at 11 n.3.

of particularity." (quoting *Mendez-Barrera v. Holder*, 602 F.3d 21, 27 (1st Cir. 2010))). In fact, this case aptly illustrates the problem with such a subjective term. Cece's own expert defined the targeted group as "young women" between the "ages of about 16, 17 up until probably about 26 or so but many minor females get caught up in this as well, children." R. 473. At the time of the hearing, Cece was just two months shy of 27. R. 501. And so the agency's attorney asked the expert whether traffickers would be interested in Cece if she were 27 at the time she returned to Albania. R. 501. The expert responded that "it's certainly possible." R. 502. But "a social group does not exist as such merely because words are sufficiently malleable to allow a litigant to sketch its margins." *Ahmed,* 611 F.3d at 94. Now Cece is 34. R. 105. Can "16, 17 - up until probably about 26," stretch further to 34? Is 34 young? It depends on whom you ask. And that is the problem with using such subjective characteristics to define a "social group."

Further, we should leave to the Board in the first instance to determine whether "living alone" and "young" should qualify as characteristics of a social group. As the *en banc* court recognizes, "[a]n appellate court errs by deciding in the first instance, without giving the Board the first opportunity on remand, whether a proposed social group is cognizable within the meaning of the Act." Opinion at 25. The court, however, reasons that the immigration judge and Board erred because they "had before them all of the facts pertaining to Cece's proposed social group and yet determined that her social group was not cognizable under the Act." Opinion at 25.

While the immigration judge and Board may have had all the facts pertaining to Cece's proposed social group before it,

they did not view Cece's proposed social group as "young Albania woman living alone." Rather, they viewed the social group as "young women who are targeted for prostitution by traffickers in Albania," or "women in danger of being trafficked as prostitutes." Opinion at 10 (citing R. 128, 131). Accordingly, the immigration judge and Board never considered the propriety of the social group defined by this court, i.e., "young Albania women living alone." More specifically, the immigration judge and Board never considered whether "young" and "living alone," could be characteristics of a social group. And since we lack the authority to decide in the first instance whether these characteristics may form a social group, remand is the appropriate course of action. *See Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam); *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam).

There is one further complication. While Cece's application for asylum and her expert witness's testimony focused on the risk to young woman, human trafficking in Albania is not so limited. Virtually everyone in Albania is a potential target for human trafficking, as explained by the U.S. Embassy's June 2012 Trafficking in Persons Report:

> Albania is primarily a source country for men, women, and children subjected to sex trafficking and forced labor, including the forced begging of children. Albanian women and children continue to be subjected to sex trafficking within the country. Albanian victims are subjected to conditions of forced labor and sex trafficking in Greece, Italy,

Macedonia, Kosovo, Serbia, and throughout Western Europe. Authorities reported finding trafficking victims from Greece and Ukraine in Albania during the year. Children were exploited for commercial sex, forced begging, and forced criminality, such as burglary and drug distribution; girls were also subjected to prostitution or forced labor after arranged marriage. There is evidence that Albanian men are subjected to forced labor in agriculture in Greece and other neighboring countries. Re-trafficking of Albanian victims continued to be a problem.[2]

Thus, girls, boys, women, and men living in Albania are subjected to human trafficking. And others are targeted, as Cece's expert testified, "because of the fact that the trafficker has something against their particular family." R. 256. But the "'generalized lawlessness and violence between diverse populations, of the sort which abounds in numerous countries and inflicts misery upon millions of innocent people daily around the world, generally is not sufficient to permit the Attorney General to grant asylum.'" *Konan v. Attorney Gen. of U.S.*, 432 F.3d 497, 506 (3d Cir. 2005) (quoting *Singh v. INS*, 134 F.3d 963, 967 (9th Cir. 1998)); *see also Ahmed v. Ashcroft*, 348 F.3d 611, 619 (7th Cir. 2003). Can individuals subjected to such "generalized lawlessness" nonetheless seek asylum by carving

---

[2] http://tirana.usembassy.gov/press-releases2/2012-press-releases/2012-trafficking-in-person-report--albania-june-20-2012/2012-trafficking-in-person-report-albania-june-20-2012.html (last visited May 8, 2013).

out the immutable or fundamental characteristics that make them the target for that violence? In other words, could virtually every Albania obtain "social group" status by identifying the characteristics that make them a target for human trafficking, when as Cece's own expert testified, "[m]ost of the time, however, [human trafficking] has simply to do with economics." R. 256. What about: "Young strong men," targeted for human trafficking for forced labor; "handicapped boys," targeted for human trafficking for forced begging; "strong boys," targeted for human trafficking for burglary; "pretty girls," targeted for sexual exploitation; and "young woman living alone," targeted for prostitution?

When the scourge of human trafficking targets such a broad segment of the population, if not the entirety of the population, it may well seem that what the victims have in common is not an immutable or fundamental trait, but the unfortunate circumstance of being targeted for any offensive purpose. That may explain why the Board concluded that this was not a "social group" within the meaning of the INA: because it is "defined in large part by the harm inflicted on the group, and does not exist independently of the traffickers." R. 9. *Accord Rreshpja v. Gonzales*, 420 F.3d 551, 555-56 (6th Cir 2005); *see also Escobar v. Holder*, 657 F.3d 537, 545 (7th Cir. 2011) (holding that a social group "cannot be defined solely by the fact that its members suffer persecution from the government or from a group that the government cannot or will not control"). But rather than rejecting Cece's proposed social group because it is defined in large part by the harm inflicted on the group, as the Board did, the better approach might be to

instead recognize that the problem is one of generalized lawlessness.

However, in the final analysis, we need not reach these difficult questions because, as discussed below, even if Cece identified a social group within the meaning of the INA, and presented a case of persecution—as opposed to generalized lawlessness—Cece still cannot prevail on her request for asylum because the Board found that "there is [in]sufficient evidence in the record … that internal relocation is not reasonable." R. 331.

B. Internal Relocation

Because Cece's application for asylum is based on a well-founded fear of future persecution, in addition to proving that she is unable or unwilling to return to Albania because of her membership in a particular social group, she also bears the added burden of proving she cannot reasonably relocate to another part of her home country to avoid persecution. *Oryakhil v. Mukasey*, 528 F.3d 993, 998 (7th Cir. 2008). "The immigration regulations contemplate two separate inquiries to determine whether an applicant could reasonably relocate within his home country: (1) whether safe relocation is possible, and if so, (2) whether it would be reasonable to expect the applicant to safely relocate." *Id*.

In this case, the Board found that Cece failed to meet her burden to show that internal relocation was not reasonable. The *en banc* court holds that the Board's conclusion is not supported by substantial evidence because its decision lacked any discussion or analysis of the issue, but merely stated "we once again find that there is insufficient evidence in the record

that internal relocation is not reasonable." Opinion at 26. But in the Board's first order before remand, it had already explained its reasoning. There was no need for the Board to restate the same analysis in the second appeal.

Turning then to the analysis of the issue of internal relocation contained in the Board's first order. The Board explained

> that, after [Cece] moved to Tirane, she felt safe and protected and there is no indication that she had any further problems. *See* Tr. at 59-60. There is no indication that anyone was looking for the applicant in Tirane, nor pursuing her there. *See* Tr. at 35 (indicating that nothing happened to the applicant in Tirane). Thus, the applicant appears to have successfully relocated within Albania. *See* 8 C.F.R. § 1208.13(b)(3)(1). There is insufficient indication in the record that she has a well-founded fear of persecution in Tirane or in another city within Albania, outside of Korce. The applicant testified that, "*if* [Reqi] wanted to come after me, he'd find me anywhere." *See* Tr. at 34. However, there is no indication that Reqi (or any other trafficker) tried or was motivated to pursue the applicant outside of Korce. Thus, we find that the applicant failed to meet her burden of proof in this case.

R. 330-331.

The Board then concluded: "In sum, we can not find that there is sufficient evidence in the record … that internal relocation is not reasonable." R. 331.

The Board's conclusion that Cece failed to show that safe relocation was not reasonable was supported by substantial evidence. Following her encounter with Reqi, Cece successfully relocated to Tirane and while there obtained a job teaching English. It is true that Cece was not living alone in Tirane—she was living in a dormitory room she shared with three other single women. But Cece was not homebound. She had to go to and from work, and about her daily affairs. Not once during the year Cece lived in Tirane was she approached by Reqi or anyone else. While Cece claimed Reqi could find her anywhere, the Board could reasonably conclude, as it did, that because no one had approached Cece in Tirane, neither Reqi nor any other trafficker was motivated to pursue Cece outside of Korce. And given Cece's testimony that she had no problems in Tirane, the Board could reasonably conclude that "[t]here is insufficient indication in the record that she has a well-founded fear of persecution in Tirane or in another city within Albania, outside of Korce." True, if she were living alone in Tirane she would fit one (of the many) profiles of those targeted by criminals. But when the profile of those targeted by criminals is so broad, as it is here, something more is necessary—some evidence that the individual has a well-founded fear that she *will* be targeted. In her case, Cece offered no evidence that she would actually be targeted in Korce and thus that she had a well-founded fear of persecution there. Without such evidence, the Board could reasonably conclude that Cece did not meet her burden of showing that internal relocation was not reasonable. Accordingly, the Board did not err in denying Cece's application for asylum and the petition for review should be denied.
I DISSENT.